**COMMON SENSE ADOPTION SERVICES, Petitioner,**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

**Common Sense Adoption Services, Petitioner,**

v.

**Department of Public Welfare, Respondent.**

**Common Sense Adoption Services, Petitioner,**

v.

**Department of Public Welfare, Respondent.**

**Common Sense Adoption Services, Petitioner,**

v.

**Department of Public Welfare, Respondent.**

**Common Sense Adoption Services, Petitioner,**

v.

**Department of Public Welfare, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 10, 2002.
Decided May 28, 2002.
As Amended June 10, 2002.

·John A. Abom, Carlisle, for petitioner.

Leonard W. Crumb, Harrisburg, for respondent.

James W. Saxton, Lancaster, for intervenor, Diakon Lutheran Social Ministries.

BEFORE: SMITH–RIBNER, Judge, and LEAVITT, Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

Common Sense Adoption Services (CSAS) petitions for review from five decisions of the Department of Public Welfare's (DPW) contracting officer, that were issued in response to five bid protests filed by CSAS with DPW. All protests concern the award of the Statewide Adoption Network Contract (SWAN) to Diakon Lutheran Social Ministries (Diakon). We affirm.

On December 11, 1999, DPW issued a Request for Proposal No. 14–99(RFP) inviting proposals for the administration of the SWAN program for the Commonwealth for the period from July 2000 to June 2005.[1] The SWAN program supports adoption services for special needs children who are in the custody of county children and youth agencies.

The Commonwealth Procurement Code (Code), 62 Pa.C.S. §§ 101–4509 is the applicable law. The Field Procurement Handbook (Handbook) written by the Department of General Services (DGS) is also applicable. The Code specifies that when an RFP is used, the relative importance of the evaluation factors shall be fixed prior to the opening of the proposals. 62 Pa. C.S. § 513(e). The RFP in this case set forth mandatory requirements and designated Sandra Gallagher, an employee of DPW, and director of SWAN, as the project officer.

On January 14, 2000 DPW held a pre-proposal conference in reference to the RFP and thereafter mailed prospective bidders written answers to questions posed at the conference. In addition, in response to a question posed at the pre-proposal conference, DPW also forwarded to prospective bidders an audit report (1999 audit) performed by the Bureau of Financial Affairs of DPW of the then current contractor of SWAN, CSAS.

On February 16, 2000, Diakon, CSAS and two other organizations submitted proposals in response to the RFP. The RFP required that each proposal be separated into three sealed parts. The three parts consisted of the technical, cost and SERB portions.[2] The Handbook provides that when proposals are opened, the technical proposals are distributed to the evaluation committee, the cost portion remains sealed until the evaluation committee meets and the SERB portion is forwarded to the DGS's Bureau of Contract Administration and Business Development.

The evaluation committee in this case consisted of 7 voting and 3 non-voting members. The committee met on March 17, 2000 and discussed and revised tentative scores they had prepared for the technical proposals. After the committee arrived at its final scores, the cost proposals were unsealed and a representative from the Governor's Budget Office converted the proposals into points. In addition, the technical scores were also converted into points so that the top-ranked proposal (Diakon) received 7000 points and the other scores were proportionately increased. The committee then accepted the SERB scores without modification or adjustment. Diakon obtained the highest score and the committee recommended to the Secretary of Public Welfare (Secretary Houston) that Diakon's proposal be accepted. Secretary Houston then reviewed the proposals and ultimately approved Diakon on April 19, 2000 as the contractor for SWAN.

---

**1.** CSAS administered the SWAN program from July 1995 to June 2000.

**2.** SERB's are small businesses "whose economic growth and development have been restricted based on social and economic bias." Handbook, Part I, Chapter 2.

On May 3, 2000 DPW notified CSAS that its proposal was not selected and that Diakon was chosen. DPW executed a contract with Diakon and on July 1, 2000, Diakon began its performance of the contract. Also in July, CSAS met with DPW for an exit conference. A debriefing conference was also held on July 24, 2000 which was attended by Gallagher and an attorney for DPW. At this time, Gallagher read aloud the evaluation committee's comments regarding CSAS's proposal.

On July 24, 2000 CSAS submitted the first of five bid protests.[3] Such protests must be filed within 7 days after the protestant knows or should have known of the facts giving rise to the protest, 62 Pa.C.S. § 1711(a). Because the protests were not resolved by mutual agreement, the contracting officer, after conducting an informal conference, issued five written decisions in accordance with 62 Pa.C.S. § 1711(c). The relief sought by CSAS in each bid protest was the termination of the SWAN contract with Diakon because of irregularities. The remedies available under 62 Pa.C.S. § 1743(1) include ratification, modification or termination.[4] The contracting officer refused to terminate the contract. This appeal followed.

In this case, Secretary Houston issued a written decision selecting Diakon for the SWAN contract. Because Secretary Houston issued a written determination selecting Diakon in accordance with the Section 513(g) of the Code, our review is governed by Section 561 of the Code. Section 561 provides that determinations required by the following sections, which

includes Section 513(g) relating to competitive sealed proposals, "are final and conclusive unless they are clearly erroneous, arbitrary, capricious or contrary to law. . . ."

In its first issue CSAS argues that proposals were improperly scored. CSAS maintains that the Code and Handbook require that the importance of evaluation factors in an RFP are to be fixed prior to the opening of proposals. 62 Pa.C.S. § 513(e) and Handbook, Part I, Chapter 6, B.2.d.2.c. Although the RFP required bidders to submit technical, cost and SERB sections, the RFP did not include any information as to the importance or weight to be given to each factor. Although internal memorandum of DPW evidences that 70% was attributable to technical, 20% to cost and 10% to SERB, no such mention was made in the RFP.

Moreover, although DPW adjusted the technical and cost scores, it failed to adjust the SERB to a 1000 point scale. Had it done so, the Central Susquehanna Intermediate Unit (CSIU) proposal would have been awarded the contract.[5]

■ Initially, DPW responds that the importance of each evaluation factor was fixed before the opening of the proposals as is evidenced by internal memorandum. CSAS's chief argument is that the RFP did not detail the weight each factor would be given. We observe however, that the Code does not require the RFP to set forth the formula which will be applied in ranking the proposals. Rather, the Section 513(e) of the Code states that "[t]he

3. CSAS submitted the remaining bid protests on July 31, 2000, September 12, 2000, September 13, 2000 and October 26, 2000.

4. This section is applicable, where as here, the person awarded the contract has not acted fraudulently or in bad faith.

5. Later in CSAS's argument, it alleges that CSIU should have been disqualified. If CSIU were disqualified, Diakon would then have the most total points if the SERB score were adjusted to a 1000 point scale. However, CSAS also argues that Diakon should have been disqualified and that CSAS would then have the most total points.

relative importance of the evaluation factors shall be fixed *prior to opening the proposals.*" (Emphasis added.) Here, DPW did fix the formula prior to the opening of the bids, as such DPW did not violate the mandate of the Code.

■ As to the computation of the SERB score, DPW argues that CSAS failed to raise this issue before the administrative agency or in its administrative appeal to this court. We agree. A review of the protests filed with the contracting officer reveals that CSAS did not raise the failure to convert the SERB score as an issue, nor is the issue included in CSAS's administrative appeal to this court. Because CSAS failed to raise the issue in its protest, the issue is waived. *S.T. v. Department of Public Welfare,* 681 A.2d 853 (Pa.Cmwlth.1996), *petition for allowance of appeal denied,* 547 Pa. 747, 690 A.2d 1165 (1997). Moreover, the issue is not listed in CSAS's petition for review and issues not raised in the petition for review are not properly before this court and we will not address them. *McGrath v. State Board of Dentistry,* 159 Pa.Cmwlth. 159, 632 A.2d 1027 (1993).[6]

The second issue presented is whether members of the evaluation committee had conflicts of interest.

Diakon's proposal contained the name of Sandra Gallagher, the SWAN program director and a non-voting member of the committee as a reference. The Diakon proposal also listed Eileen West, a voting member of the committee as a reference. CSAS argues that 62 Pa.C.S. § 2301 requires that "public employees discharge their duties impartially." Here, Gallagher and West, at a minimum should have disclosed their association with Diakon. In addition, CSAS alleges that Gallagher held influence over a voting member of the committee, Robin Linn, who was a subordinate of Gallagher's.

■ DPW responds that neither Sandra Gallagher nor Eileen West authorized or had any knowledge that Diakon listed them as references. In this case, the RFP required bidders to list the name, address and phone number of customers to describe prior experience "that demonstrates [that the offeror] can operate a complex program ... and can successfully manage funds of this magnitude." (R.R. 19a.) The RFP further required the offeror to provide "the name, address and telephone number of the responsible official of the customer, company, or agency who may be contacted" to confirm the prior experience. (R.R. at 19a–20a.) We agree with DPW that because Diakon had done work for DPW in the past, Diakon properly identified Gallagher and West as individuals who could provide verification of prior work experience. Merely because Diakon identified Gallagher and West, as well as all other contact individuals using the term "client reference", it does not follow that Gallagher and West were representing Diakon. Because the RFP required offerors to list prior work experience and individuals who could be contacted to verify such, Diakon properly complied with this requirement by listing among others, Gallagher and West as individuals who could confirm prior work experience.

■ In addition, CSAS's allegation that Gallagher influenced Linn, a voting member of the committee, to favor Diakon is not supported by the record. Specifically, the fact that Linn did not favor Diakon is evidenced by the fact that in voting on the

---

**6.** Although CSAS maintains that it raised this issue in the cover letter which accompanied Bid Protest # 4, no mention is made in that letter that DPW failed to properly convert the SERB scores.

proposals Linn gave the highest rating not to Diakon but to Central Susquehanna. As such, there is no evidence that Gallagher somehow influenced Linn to treat Diakon favorably.

Next CSAS maintains that DPW permitted the evaluation committee to consider factors not specified in the RFP.

The RFP establishes the common standard that ensures fair and just competition between the bidders. The Handbook sets forth those conditions that should be included in every RFP. The Handbook explains that a fair competition necessitates an understanding on the part of all competitors of the basis upon which the award will be made. This is also essential to assure the proposals will be as responsive as possible so the agency can obtain the best possible proposal. No other factors or criteria shall be used in the evaluation. Handbook, Part I, Chapter 6.

Here CSAS maintains that the evaluation committee considered two factors not enumerated in the RFP. First, they considered CSAS's 1999 audit and in addition Sandra Gallagher improperly addressed the evaluation committee. Specifically, she gave her opinion as to issues and concerns DPW had with CSAS.

As to the 1999 audit report, the contracting officer determined and DPW argues that all issues relating to the 1999 audit were untimely raised because the 1999 audit report was distributed to all offerors, including CSAS on January 21, 2000, as part of the written answers to questions received during the pre-proposal conference. In accordance with Part I, Chapter 6.B.5.d of the Handbook "[t]hese answers constitute a formal amendment to

the RFP." Because CSAS received answers to the pre-proposal questions, which contained the 1999 audit, CSAS was on notice that the 1999 audit became a formal amendment to the RFP. As such, in accordance with 62 Pa.C.S. § 1711(a) CSAS had seven days from the time it received the answer to file a protest because Section 1711 provides that "[a]ll protests under this subsection must be made within seven days after the protestant knows of should have known of the facts giving rise to the protest."

■ Although CSAS maintains that it did not know that the committee actually received a copy of the 1999 audit report until July 24, 2000, as discussed by the contracting officer, in accordance with the Handbook all answers provided in response to pre-proposal questions including the 1999 audit, became a formal amendment to the RFP. As such, because CSAS was on notice that the 1999 audit constituted a formal amendment to the RFP and because CSAS failed to file a protest within seven days of receiving same, the issue was untimely raised.[7]

The next issue presented is whether DPW should have disqualified 2 of the 4 bid proposals because they did not meet the minimum bidding requirements.

CSAS argues that an award in the competitive bidding context must be overturned if mandatory requirements in the bid instructions are not followed. *Conduit & Foundation v. City of Philadelphia*, 41 Pa.Cmwlth. 641, 401 A.2d 376 (1979). Here, the RFP specifically informed bidders not to include "cost data" in their proposals. Specifically, Part I–23 of the

---

7. Nonetheless we also observe that the RFP required each offeror to include a description of relevant past experience. Names of individuals, agencies and phone numbers were requested. As such offerors were on notice

that input from clients would be contained and considered. As such CSAS's prior experience with DPW, via the 1999 audit was a proper consideration for the evaluation committee.

RFP stated "All cost data for the proposal shall be submitted in a separate sealed envelope within the sealed proposal and kept separate from the technical proposal. Failure to meet this requirement will result in automatic disqualification of the proposal." CSAS argues that Diakon's proposal should have been disqualified because in the technical section of its proposal Diakon included a letter from Mellon Bank stating that "Mellon Bank, N.A. is pleased to make available $1,000,000 discretionary line of credit to Tressler Lutheran Services." CSAS maintains that this constituted cost information that should not have appeared in the technical proposal.

■ The contracting officer found and we agree that the Mellon Bank letter simply indicated that the bank was giving a line of credit, it did not mention the amount of the bid. As per the requirements of the RFP, Diakon submitted its cost proposal in a separate sealed envelope. This situation is distinguishable from one on which CSAS relies. The line of credit in this case did not disclose the cost that would be charged by Diakon and therefore did not violate the bidding requirements.[8]

CSAS also maintains that the CSIU proposal should have been disqualified because it failed to provide a line of credit as required by the RFP.

■ We again agree with the contracting officer that CSAS failed to timely raise this issue. Specifically, CSIU's proposal was made available to CSAS on September 6, 2000. As CSAS failed to file a protest with respect to this issue until October 26, 2000, which is beyond the seven day re-

quirement set forth in 62 Pa.C.S. § 1711(a), the issue is waived.

Next we will address whether DPW improperly refused to disclose competing offerors' proposals following the execution of the SWAN contract.

Although Part I, Chapter 50, D.1 of the Handbook provides that once a contract has been executed, all bids are subject to disclosure and are thus public records, DPW, for two months, refused to disclose the contents of the bids to CSAS. CSAS argues that such a clear violation permits this court to terminate the SWAN contract pursuant to 62 Pa.C.S. § 1743(1).

■ Although we agree with CSAS that DPW violated the Handbook when it initially refused to disclose the contents of the other offerors' proposals, we also agree with the contracting officer that the issue is now moot as DPW has made the proposals available and in addition, CSAS is not aggrieved by DPW's post award response to its request for access to competitors' proposals. Specifically, in order to be aggrieved for purposes of the Procurement Code, the acts or omission of which that person complains must be connected with the "solicitation or award of a contract." 62 Pa.C.S. § 1711(a). The process of soliciting and awarding the SWAN contract was completed June 2000, when Diakon executed the contract. This issue concerns events that occurred in July of 2000, after the procurement process was completed. As such, CSAS is not aggrieved.

CSAS next alleges that it was error for the evaluation committee not to participate in the debriefing conference.

8. CSAS also contends that DPW, at the pre-proposal conference, orally amended the RFP to provide that no dollar values should be given in the credit line section. DPW responds that these purported facts are not in the record, CSAS did not preserve this issue in its petition for review and the facts that are in the record contradict CSAS's assertion of the oral modification.

CSAS maintains that it requested the identities of the evaluation committee members from DPW on July 17, 2000 and requested that DPW have the evaluation committee members in attendance at the July 24, 2000 debriefing as required by Part I, Chapter 6, B.10.a of the Handbook. The Handbook provides that "[i]f requested by nonselected offerors, the issuing office will arrange a debriefing conference(s), as required. The Evaluation Committee will participate in the debriefing." Handbook, Part I, Chapter 6.B.10.a.

■■ DPW again responds that in order to be aggrieved for purposes of the Procurement Code, the acts or omissions of which that person complains must be concerned with the "solicitation or award of a contract." 62 Pa.C.S. § 1711(a). We agree. Here, DPW executed its contract with Diakon in June 2000, and the debriefing meeting referenced by CSAS occurred in July 2000. The manner in which the debriefing conference was conducted has nothing to do with the solicitation or award of the contract and thus falls outside the scope of § 1711(a). Therefore, the events relative to the debriefing conference do not cause CSAS to be aggrieved.

■■ Moreover, as DPW has since provided the names of the committee members, that issue is moot. In the alternative, we agree with the contracting officer that the Handbook's participation requirement had been satisfied as a result of the evaluation committee's participation in preparing the written debriefing. The Handbook distinguishes between the explanation of the strength and weaknesses of the offeror's proposal, known as debriefing, and the meeting at which that explanation is presented known as the debriefing conference. Thus "[i]t is strongly recommended the debriefing be written beforehand and read to the offeror during the debriefing conference." Handbook,

Part I, Chapter 6, B.10.c. Here, the committee participated in the preparation of the written debriefing, i.e. by providing their comments on the proposals to the project officer, who then records those comments in her notes. The project officer, Gallagher, then attended a meeting with CSAS and read the written debriefing to CSAS's representatives.

The final issue raised is whether the Diakon contract should be terminated.

CSAS maintains that the contract with Diakon should be terminated because it is not in the best interest of the Commonwealth to affirm the contract in light of the fact that DPW violated the Procurement Code. Because DPW failed to follow the Procurement Code and Handbook, there is no way to actually determine whether it received the best possible proposal.

■■ The Code specifies that, after the execution of a contract, if it is determined that the solicitation or award was in violation of the law, the contract may be affirmed if it is in the best interest of the Commonwealth, the contract may be modified or the contract may be terminated. 62 Pa.C.S. § 1743(1). Although no violation of the law occurred in the solicitation or award of the contract, there is no excuse for the Department's carelessness in adhering to its own Handbook provisions on prompt disclosure of proposals, participation in debriefing by Evaluation Committee members, etc., which may have avoided this litigation. However, there is no proof in the record that the Department regularly engages in such deviations and, more important, as the contracting officer determined, even if CSAS was in any way aggrieved, ratification of the contract is in the best interest of the Commonwealth. Specifically, Diakon was selected for the SWAN contract based on the merits of its proposal, and continued

performance by Diakon advances the interests of the Commonwealth.

In accordance with the above, we affirm the determinations of the contracting officer.

### ORDER

Now, May 28, 2002, the written determinations of the contracting officer dated November 17, 2000, November 22, 2000, January 4, 2001, January 9, 2001 and February 26, 2001 are affirmed.