**OMNICARE, INC., Petitioner**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 11, 2013.

Decided May 15, 2013.

C. Grainger Bowman and Robert A. Lawton, Harrisburg, for petitioner.

Matthew D. Stauffer, Assistant Counsel, Harrisburg, for respondent.

BEFORE: PELLEGRINI, President Judge, COHN JUBELIRER, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Omnicare, Inc. (Omnicare) petitions for review of the Final Agency Determination (Final Determination) of the Director of the Bureau of Administrative Services (Director) of the Department of Public Welfare (DPW) that denied Omnicare's bid protest (Protest) of the award of a contract (Contract) for the provision of pharmaceuticals for DPW's five Developmentally Disabled Centers (DDCs) to Diamond Drugs, Inc. (Diamond). Omnicare argues that the Director erred in holding its Protest was untimely, and that DPW violated the Commonwealth Procurement Code (Code), 62 Pa.C.S. §§ 101—2311, when it used the Medical Assistance (MA) pricing formula[1]

1. Under the MA program, described in Article IV(F) of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. §§ 441.1–449, the Commonwealth of Pennsyl-

for pharmaceuticals to which this formula cannot apply, and failed to evaluate costs when considering proposals for the Contract.

■ DPW operates five DDCs at which it previously maintained its own pharmacies in combination with an incumbent contract vendor, Omnicare, to provide medications to the DDCs' residents. (Final Determination at 9; Request for Proposals for Pharmacy Management Services (RFP 18–09) Part IV at 2, R.R. at 92a.) On March 10, 2011, DPW issued RFP 18–09 for the purpose of providing and delivering all pharmaceuticals, medical and pharmaceutical supplies, clinical support, and billing services to the DDCs so that it could consolidate its pharmaceutical sourcing to a single vendor and shut down its existing pharmacies. (RFP 18–09 §§ I–4, IV–4, R.R. at 61 a, 95a–102a.)

RFP 18–09 contained the following provisions: (1) the contracted vendor would supply both legend and non-legend pharmaceuticals [2] for the DDCs, (RFP 18–09 § I–4, R.R. at 61 a); (2) with regard to compensation, "[t]he selected vendor will be reimbursed through either Medicare Part D based upon the resident's Prescription Drug Plan (PDP) or billed directly to each individual DDC," (RFP 18–09 § I–5, R.R. at 62a); (3) there should be no cost submittal with proposals and the selection of the winning vendor would be based 80% on the technical elements and 20% on disadvantaged business participation, with bonus points for domestic workforce utilization, enterprise zone small business participation, and contractor partnership program participation, (RFP 18–09 at 16, §§ II–11, III–4, R.R. at 73a, 84a, 86a); (4) offerors could submit questions to DPW by email, (RFP 18–09 § I10, R.R. at 62a–63a); and (5) any protests in connection with the RFP must comply with the provisions of Section 1711.1 of the Code, 62 Pa.C.S. § 1711.1, and could be filed "[i]n no event ... later than seven days after the date the notice of award of the contract is posted on the" Department of General Services (DGS) website, (RFP 18–09 § I–29, R.R. at 72a).

Four offerors, including Omnicare, submitted proposals to DPW on April 29, 2011. DPW scored Diamond's proposal the highest and selected it for the Contract. (Recommendation for Contractor Selection at 3, R.R. at 119a.) DPW scored Omnicare's proposal the third-highest, with 7,193 points, compared to Diamond's 10,415 points. (Recommendation for Contractor Selection at 3–4, R.R. at 119a–20a.) DPW officially notified Omnicare that it was not selected for the Contract on July 25, 2011. (Letter from DPW to Omnicare (July 25, 2011), R.R. at 145a.) At Omnicare's request, DPW provided Omnicare with a debriefing, at which DPW informed

vania (Commonwealth) pays for medical treatment for low-income individuals. DPW regulations provide that the MA program will not pay for certain prescription and non-prescription pharmaceuticals, or for pharmaceuticals prescribed for certain purposes. 55 Pa.Code §§ 1121.53(d), 1121.54. DPW's regulations provide a method or formula to determine the amount the MA program will pay for compensable drugs. 55 Pa.Code § 1121.56. This opinion refers to the provisions of the DPW's regulation at Section 1121.56 as "the MA pricing formula."

2. DPW's regulations define a "legend drug" as "[a] drug or product that under Federal law or State law can be dispensed only upon the order of a physician," and a "non[-] legend drug" as "[a] drug or product that can be purchased without a prescription." 55 Pa. Code § 1121.2. Certain enumerated types of non-legend drugs are compensable under the MA pricing formula. 55 Pa.Code § 1121.53(d). Similarly, legend drugs are non-compensable when prescribed for certain conditions or purposes, or under certain circumstances. 55 Pa.Code § 1121.54.

Omnicare that its proposal was ranked third. DPW notified Diamond of the approval of the Contract on March 2, 2012. (Letter from DPW to Diamond (March 2, 2012) at 1, R.R. at 127a.) On that date a copy of the executed Contract was posted on the website of the Pennsylvania Treasury Department (Treasury). In the process of preparing to transition from Omnicare to Diamond, DPW informed Omnicare on March 14, 2012 that it had selected Diamond for the Contract. A copy of the Contract was posted to the DGS website on April 27, 2012.

Omnicare filed its Protest on May 4, 2012, protesting that the Contract was awarded without considering price and without competitive bidding for medications that would be paid for by the DDCs rather than a third-party such as Medicare or a private insurer. (Omnicare Bid Protest at 2, R.R. at 5a.) DPW's Contracting Officer responded on May 21, 2012, stating that Omnicare's Protest was untimely for a number of reasons, including that the information that Omnicare needed for its Protest was in RFP 18–09, and that DPW's solicitation did not violate the Code. (Contracting Officer's Response at 4, 6, R.R. at 141a, 143a.) Omnicare replied to the Contracting Officer's Response on June 8, 2012, generally asserting the same arguments as it asserts in this appeal.

The Director issued the Final Determination on July 3, 2012. In the Final Determination, the Director first held that Omnicare's Protest was untimely because

RFP 18–09 stated that pricing would not be considered. (Final Determination at 4.) The Final Determination also stated that RFP 18–09 was clear that all drugs were to be included. (Final Determination at 5.) The Final Determination stated that DPW's solicitation was not contrary to the Code because a cost evaluation factor was not necessary due to DPW's use of the MA pricing formula for medications to be paid for by the DDCs. (Final Determination at 7.) Finally, the Director stated that, even if the Contract were contrary to the Code, he ratified the Contract as being in the Commonwealth of Pennsylvania's best interests pursuant to Section 1711.2(2)(i) of the Code, 62 Pa.C.S. § 1711.2(2)(i). (Final Determination at 8.) Omnicare now appeals to this Court.[3, 4]

Before this Court, Omnicare argues that it timely filed its Protest because it could not know the basis of its Protest from RFP 18–09 and was not required by RFP 18–09 to file its Protest until the Contract was posted on the DGS website. Omnicare also argues that DPW violated the Code by failing to consider price as an element of the proposals and that DPW may not apply the MA pricing formula to non-compensable drugs. DPW argues that, even if it did violate the Code, it properly ratified the Contract between Diamond and DPW pursuant to Section 1711.2(2)(i).

■ In the Final Determination, the Director held that Omnicare's Protest was untimely because Omnicare knew or

---

3. In considering an appeal of an agency determination on a protest of a solicitation or award:

> [t]he court shall hear the appeal, without a jury, on the record of determination certified by the purchasing agency. The court shall affirm the determination of the purchasing agency unless it finds from the record that the determination is arbitrary and

capricious, an abuse of discretion or is contrary to law.

62 Pa.C.S. § 1711.1(i).

4. This Court denied Omnicare's Application for Supersedeas, which asked this Court to stay the transition of pharmacy management services to Diamond, by Order dated September 26, 2012.

should have known from the terms of RFP 18–09 the factual basis for the issues it complained of in its Protest. Section 1711.1(b) provides that a prospective bidder must file its protest within seven days of the date on which it knew or should have known of the facts giving rise to its protest:

> If the protestant is a bidder or offeror or a prospective contractor, the protest shall be filed with the head of the purchasing agency within seven days after the aggrieved bidder or offeror or prospective contractor knew or should have known of the facts giving rise to the protest except that in no event may a protest be filed later than seven days after the date the contract was awarded. If the protestant is a prospective bidder or offeror, a protest shall be filed with the head of the purchasing agency prior to the bid opening time or the proposal receipt date. If a bidder or offeror, a prospective bidder or offeror or a prospective contractor fails to file a protest or files an untimely protest, the bidder or offeror, the prospective bidder or offeror or the prospective contractor shall be deemed to have waived its right to protest the solicitation or award of the contract in any forum. Untimely filed protests shall be disregarded by the purchasing agency.

62 Pa.C.S. § 1711.1(b). Omnicare argues that it is not bound by the timeliness requirements of Section 1711.1(b) because Section I–29 of RFP 18–09 requires only that "[i]n no event may an Offeror file a protest later than seven days after the date the notice of award of the contract is posted on the DGS website." (RFP 18–09 § I–29, R.R. at 72a.) Omnicare asserts that this statement lulled it into believing it was not required to file its Protest until after DPW posted the Contract on the DGS website and that DPW must, therefore, be estopped from asserting a differ-

ent deadline. In support, Omnicare cites *Department of Public Welfare v. UEC, Inc.*, 483 Pa. 503, 514, 397 A.2d 779, 784 (Pa.1979), in which the Pennsylvania Supreme Court held that DPW was estopped from asserting a six-month statute of limitations where it repeatedly assured Universal Education Corporation, Inc., that it would pay the balance due under a terminated contract. A party may be estopped from invoking a "bar of limitation of action" where "through fraud or concealment the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry." *Nesbitt v. Erie Coach Co.*, 416 Pa. 89, 92, 204 A.2d 473, 475 (1964). "It is ... well established that mere negotiations toward an amicable settlement afford no basis for an estoppel, nor do mistakes, misunderstandings or lack of knowledge in themselves toll the running of the statute." *Id.* at 93, 204 A.2d at 475.

In this case, however, DPW did not misrepresent the timeliness requirement for bid protests. In addition to the language relied upon by Omnicare, Section I–29 *also* states that protests must comply with the requirements of Section 1711.1. The statement that "[i]n no event may an Offerer file a protest later than seven days after the notice of award of the contract is posted on the DGS website," (RFP 18–09 § I–29, R.R. at 72a), does not conflict with Section 1711.1(b) and would not lull a party reading Section 1711.1 into failing to exercise its protest rights under Section 1711.1. Therefore, Omnicare was required to file its Protest within seven days of the date it knew or should have known of the facts giving rise to its Protest.

The timeliness of Omnicare's Protest depends on whether it knew or should have known of the basis of the Protest after reviewing the terms of RFP 18–09. Omnicare's Protest is based on its contention that DPW erred by failing to consider

price insofar as the Contract covers medications for which the DDCs themselves, rather than a third-party payer, will pay. Omnicare argues that it did not know the basis of the Protest until the Contract was posted to the DGS website and Omnicare saw that the Contract included pharmaceuticals that were not compensable through third-party payers, but would nonetheless be paid for at prices arrived at using the MA pricing formula. DPW argues that RFP 18–09 stated that *all* pharmaceuticals were to be included in the Contract and was clear that the MA pricing formula would be used to arrive at prices for pharmaceuticals to be paid for by the DDCs. Therefore, DPW argues, Omnicare should have known of the basis for its Protest from RFP 18–09.

While RFP 18–09 was clear that DPW did not intend to consider price as an element of the bids and intended to set prices for pharmaceuticals under the Contract using the MA pricing formula, RFP 18–09 was not clear that DPW intended it to cover non-compensable pharmaceuticals. Therefore, we cannot conclude that Omnicare should necessarily have known, on the basis of the terms of RFP 18–09 alone, that the Contract would include non-compensable pharmaceuticals, which are not covered by the MA pricing formula, without competitive bidding. As DPW points out, RFP 18–09 states that "[t]he [DDCs] seek contracted pharmacy services to fill orders for *all* pharmaceuticals from each facility regardless of mechanism of payment." (RFP 18–09 § IV–1(b), R.R. at 94a (emphasis added).) However, elsewhere, where RFP 18–09 is more specific, it distinguishes between prescription and non-prescription drugs,[5] but not between those that are compensable under insurance, Medicare, and MA, and those that are not:

> [DPW] seeks pharmacy management services including, but not limited to, the dispensing of pharmaceuticals (legend and non-legend), medical/pharmaceutical supplies, clinical support and billing using Medicare Part D, individualized billings for non-Medicare [P]art D drugs using PA Medicaid pricing formula to each facility with the projected implementation of the Medical Assistance billing system . . .

(RFP 18–09 § I–4, R.R. at 61a.) When referring to billing and the costs that may be borne by the DDCs directly, RFP 18–09 generally speaks in terms of individuals who are not Medicare-or MA-eligible, rather than in terms of non-compensable drugs:

> The vendor must be able to bill Medicare Parts B and D (PDPs [prescription drug plans] as specified previously), Medical Assistance (MA) using required billing mechanisms, and any other relevant commercial insurance. The vendor must comply with all billing requirements for Medicare Part D and the Pennsylvania Medical Assistance Program including the use of appropriate claims forms and electronic submission. For residents not eligible for Medicare the selected vendor will bill each DDC directly. In the future, [DPW] intends for the selected vendor to submit claims covered by Pennsylvania MA through the Pennsylvania MA claims processing system.

(RFP 18–09 § IV–4(*o*), R.R. at 101a–02a.) Similarly, in describing the current practice of the DDCs, RFP 18–09 states that most of the DDCs:

---

**5.** As discussed in footnote 2, *supra,* whether a drug requires a prescription does not deter- mine whether it is compensable.

use two pharmacy strategies. Medicare [P]art D drugs for those eligible individuals are dispensed by a contract pharmacy and the remainder of the drugs including those that are not covered under Medicare Part D as well as those for people that do not have Medicare are dispensed by each center's in-house pharmacy.

(RFP 18–09 § IV, R.R. at 93a.) [6]

Given that RFP 18–09 was not clear that it sought a vendor to provide not only the types of Medicare- and MA-covered pharmaceuticals that it had sought from outside vendors in the past, but also noncompensable pharmaceuticals, we hold that the Director erred in holding that Omnicare should have known from RFP 18–09 that DPW was seeking to purchase, without competitive bidding, noncompensable medications for which there was no set price under DPW's regulations.

The Contract, in contrast, explicitly states that it is to cover noncompensable drugs: "Residents who are dual eligible will be billed electronically; any [over-the-counter] or other *non-compensable medications* will be billed to the Facility." (Diamond's Proposal at 23, R.R. at 45a; *see also* Contract at 2, R.R. at 130a (incorporating Diamond's Proposal into the Contract) (emphasis added).) Therefore, it was the Contract that explicitly informed Omnicare of the facts on which it based its Protest. Thus, pursuant to RFP 18–09 and Section 1711.1(b) of the Code, Omnicare had seven days from the notice of the award of the Contract within which to file its Protest.

DPW argues briefly, and without elaboration, that Omnicare should be charged with the knowledge of the terms of the Contract from March 2, 2012, the date DPW posted the Contract on the Treasury website. However, RFP 18–09 stated "[i]n no event may an Offeror file a protest later than seven days after the date the notice of award of the contract is posted on *the DGS website.*" (RFP 18–09 § I–29, R.R. at 72a (emphasis added).) This explicitly set the expectation that the notice of the award of the Contract would be posted to the DGS website rather than announced elsewhere. DPW does not argue that Omnicare actually received notice of the language of the Contract prior to its posting on the DGS website, nor does DPW argue that Omnicare should have expected to find or known to look for the Contract on the Treasury website. DPW posted the Contract on the DGS website on April 27, 2012. Omnicare filed its bid protest seven days later, on May 4, 2012. Therefore, the Director erred in holding that Omnicare's Protest was untimely.

■ We next address Omnicare's argument that DPW violated the Code by failing to consider price as an element of the bids when it contracted to purchase pharmaceuticals for which there was no set pricing scheme. Section 513 of the Code, 62 Pa.C.S. § 513, provides for a competitive sealed proposal process in situations where a competitive bidding process would not be advantageous to the Commonwealth. Under a competitive *bidding* process, a contract must be awarded to the lowest responsible bidder. Section 512(g)

---

**6.** RFP 18–09 is somewhat contradictory on whether the DDCs' in-house pharmacies were accessible for ineligible individuals or noncompensable drugs, stating elsewhere that:

[i]n the past each center had its own pharmacy that dispensed all drugs used at the centers. Since the advent of the Medicare Part D program, the centers have had a contracted pharmacy to provide the drugs paid for by Medicare Part D and used the in-house pharmacies for those drugs not covered under Medicare Part D.

(RFP 18–09 § IV, R.R. at 92a.)

of the Code, 62 Pa.C.S. § 512(g). By contrast, under the competitive *sealed proposal* process, the purchasing agency may establish evaluation criteria and, after evaluating proposals based on these criteria, enter into negotiations with the offeror whose proposal is deemed most advantageous to the Commonwealth. 62 Pa.C.S. § 513(e), (g). Section 513(g) requires that a purchasing agency consider price in the competitive sealed proposal process: "[t]he responsible offeror whose proposal is determined in writing to be the most advantageous to the purchasing agency, *taking into consideration price* and all evaluation factors, shall be selected for contract negotiation." 62 Pa.C.S. § 513(g) (emphasis added). Omnicare argues that, because DPW did not consider price in evaluating the proposals, it violated Section 513(g) of the Code.

DPW asserts that the Code permits an agency to establish "[t]he relative importance of the evaluation factors . . . prior to the opening proposals," 62 Pa.C.S. § 513(e), and that, to the extent that it was required to consider price, it did so, by setting the price itself. DPW argues it determined that, under the Contract, the selected offeror would bill Medicare for Medicare-covered pharmaceuticals, and that the MA pricing formula would be used to establish the price for all other pharmaceuticals, whether actually compensable by MA or not. (RFP 18–09 § I–4, R.R. at 61a.) Thus, DPW argues, the Contract would cost DPW the same amount regardless of which offeror won the Contract.

Whether an agency can use a set-price proposal process pursuant to Section 513 appears to be a question of first impression; the parties neither cite a similar case nor has this Court's research revealed such a case. Section 513(g), as discussed above, explicitly requires that price be considered as an element of the competitive

sealed proposal process. In addition, the regulation promulgated pursuant to the Code governing the competitive proposal process at 4 Pa.Code § 69.6(f) envisions that all proposals will contain a price element: "[t]he Committee shall then open packages containing the price and assign to it a point value." DPW argues that its set-price approach is permissible because it is using the reimbursement rates established by Medicare, MA, and DDC residents' private insurers. However, it appears that under the Contract, DPW will pay directly for non-compensable medications. While DPW argues that it may adopt the MA pricing formula found at Section 1121.56 of the MA regulations, 55 Pa.Code § 1121.56, this provision states "[t]he Department will base its drug cost for *compensable* legend and non[-]legend drugs on the lower of" a number of factors. 55 Pa.Code § 1121.56 (emphasis added). Thus, Section 1121.56 applies only to MA-compensable drugs. DPW argues that it may, nonetheless, adopt the MA pricing formula set out in Section 1121.56 to set a price for non-compensable drugs. In doing so, and in failing to consider pricing for non-compensable drugs as an element of the proposals, DPW deprived itself and the offerors of the opportunity to discover whether an offeror could offer better prices for noncompensable drugs than those arrived at by using the MA pricing formula. Given that the offerors' prices for non-compensable drugs could have differed, DPW violated Section 513(g) by failing to consider pricing as an element of the proposals.

■ DPW argues that, even if it violated the Code, this Court should dismiss Omnicare's appeal because the Director ratified the Contract pursuant to Section 1711.2 of the Code as being in the Commonwealth's best interest.[7] Section 1711.2 provides in relevant part that:

---

7. DPW argues that Omnicare has waived any argument that the ratification was erroneous

If the head of a purchasing agency or his designee determines that a solicitation or award of a contract is contrary to law, the following apply:

. . . .

(2) If the determination is made after the execution of a contract and the person awarded the contract has not acted fraudulently or in bad faith:

(i) the contract may be ratified and affirmed, provided it is determined by the head of the purchasing agency or his designee that doing so is in the best interest of the Commonwealth;

(ii) the contract, with the consent of all parties, may be modified to comply with the law; or

(iii) the contract may be terminated and the person awarded the contract shall be compensated for the actual expenses reasonably incurred under the contract prior to the termination. Such compensation shall not include loss of anticipated profit, loss of use of money or administrative or overhead costs.

62 Pa.C.S. § 1711.2(2). In the Final Determination, after holding that the procurement process for the Contract did not violate the Code, the Director stated that "[e]ven if the selection of Diamond for

contract award is to be found to be contrary to law, I ratify and affirm the contract as being in the best interests of the Commonwealth" pursuant to Section 1711.2(2). (Final Determination at 8.)

In this case, the solicitation of proposals was contrary to law because DPW failed to solicit pricing information from the vendors. Because of this failure, the Director lacked the factual basis it needed to properly determine whether ratification of the Contract was "in the best interest of the Commonwealth." 62 Pa.C.S. § 1711.2(2)(i). Thus, any consideration of the Commonwealth's best interests was flawed by the same defect that marred the solicitation process.

This interpretation of the plain language of Section 1711.2 is consistent with this Court's prior decisions involving Section 1711.2 or substantially similar provisions. In *Common Sense Adoption Services v. Department of Public Welfare*, 799 A.2d 225, 232 (Pa.Cmwlth.2002), this Court held that DPW violated the DGS Procurement Handbook (Handbook) [8] by failing to disclose the bids of the other offerors to an offeror that was not awarded the contract at issue. In considering whether the contract in that case should have been ratified, modified, or terminated under a prior provision similar to Section 1711.2, this

___

or contrary to law by failing to raise such issues in its Petition for Review to this Court or in its brief. Omnicare addresses DPW's ratification argument in its Reply Brief, contending that if this Court allows DPW to ratify the Contract as a response to Omnicare's Protest, Omnicare is effectively left without any real recourse for violations of the Procurement Code. (Omnicare's Reply Br. at 11–12.) DPW's argument that the Director's ratification cures any and all defects in the bidding process, including the solicitation or evaluation of the proposals, is an *alternative* basis which DPW urges this Court to accept as justifying its Final Determination and, as such, it is not one this Court is bound to accept.

**8.** The purpose of the Handbook is to provide "a standard reference to established policy, procedures, and guidelines for the procurement of supplies, services, and construction under the authority of the" Code and to promote uniformity in agency procurements. (Handbook, Pt. 1, Ch1 § A, found at http://www.portal.state.pa.us/portal/server.pt/document/642816/pt_i_ch_01_general_provisions_pdf). However, the Handbook is advisory and its provisions do not constitute regulations or binding norms. (Handbook, Pt. 1, Ch1 § D.)

Court took notice of the fact that DPW failed to follow the Handbook, but noted that there was no violation of the Code, and that the offeror that was awarded the Contract was selected based on the merits of its proposal. *Id.* at 233–34. In *Common Sense,* the violation of the Handbook did not relate to the selection of the winning offeror, but DPW's failure to properly disclose bids after the contract was awarded. Thus, despite the error, DPW was still able to properly evaluate which offer was in the best interests of the Commonwealth. In this case, by contrast, DPW's violation of the Code directly relates to the method by which it solicited proposals and selected the winning offeror. Because DPW failed to solicit and, therefore, never received pricing information from the prospective vendors, the Director could not evaluate whether the Contract was in the best interests of the Commonwealth by looking to all of the relevant and statutorily-required factors.

For these reasons, we must reverse the Final Determination of DPW in this matter and declare the Contract void pursuant to Section 1711.1(j) of the Code, 62 Pa.C.S. § 1711.1(j).[9]

### *ORDER*

**NOW,** May 15, 2013, the Final Determination of the Department of Public Welfare in the above-captioned matter is hereby **REVERSED** and the contract between Diamond Drugs, Inc. and the Department of Public Welfare that is the subject of the above-captioned matter is hereby declared void.

---

9. Section 1711.1(j) provides that if this Court "determines that the solicitation or award of a contract is contrary to law, then the remedy the court shall order is limited to canceling the solicitation or award and declaring void any resulting contract." 62 Pa.C.S. § 1711.1(j).