# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

PA Home Care Association,      :
            Petitioner      :
                       :
         v.      :    No. 629 M.D. 2022
                       :    Argued: September 11, 2023
The Commonwealth of Pennsylvania,      :
Department of Human Services;      :
Meg Snead, in her official capacity as      :
Acting Secretary of the Department of      :
Human Services; Jamie Buchenauer,      :
in her official capacity as Deputy      :
Secretary for the Department of      :
Human Services' Office of Long-Term      :
Living,      :
            Respondents      :


BEFORE:     **HONORABLE RENÉE COHN JUBELIRER,** President Judge
                 **HONORABLE MICHAEL H. WOJCIK,** Judge
                 **HONORABLE MARY HANNAH LEAVITT,** Senior Judge


**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**PRESIDENT JUDGE COHN JUBELIRER**          **FILED: October 20, 2023**

Before the Court are the Preliminary Objections (POs) of The Commonwealth of Pennsylvania, Department of Human Services (Department), Dr. Valerie Arkoosh,[1] in her official capacity as Secretary of Human Services (Secretary), and

---

[1] Although the Petition names Meg Snead as the Acting Secretary, Snead was replaced by Dr. Arkoosh, who was confirmed as Secretary on June 29, 2023, and who is automatically substituted as a respondent per Pennsylvania Rule of Appellate Procedure 502(c), Pa.R.A.P. 502(c).

Jamie Buchenauer,[2] in her official capacity as Deputy Secretary for the Department's Office of Long-Term Living (Office) (collectively, Respondents), to PA Home Care Association's (PHA) "Petition for Review in the Nature of a Complaint for Declaratory Relief" (Petition). In the Petition, PHA challenges the validity of the Department's Request for Application 08-22 (RFA), through which the Department intends to implement its Agency With Choice (AWC) model for certain Medical Assistance (MA) participants receiving Home- and Community-Based Services (HCBS). In their POs, Respondents argue the Petition should be dismissed because PHA lacks standing to assert the claims raised and this Court lacks subject matter jurisdiction as there is an exclusive statutory remedy within the Commonwealth Procurement Code (Procurement Code), 62 Pa.C.S. §§ 101-2311, for PHA's members to assert these claims.

## I.    THE PETITION

The Petition alleges the following facts. PHA is a not-for-profit state trade association that represents almost 700 organizations that provide a variety of medical and personal care, support, and therapies to individuals in their own homes. (Petition ¶¶ 12-13.) The Department is responsible for administering various programs including HCBS, which is available to those "with physical disabilities or who are dually eligible for Medicaid and Medicare[.]" (*Id.* ¶ 26.) The Department offers HCBS through three programs: "the Community HealthChoices ('CHC')

---

[2] Buchenauer no longer appears to be Deputy Secretary for the Office of Long-Term Living; Juliet Marsala has assumed that role per the Department's website.

program,[3] the Omnibus Budget Reconciliation Act ('OBRA') Waiver program,[4] and the state-funded Act 150 program,[5]" all of which are administered through the Office. (*Id*. ¶¶ 19, 26.) Many of these programs are provided through the MA Program, which is funded by state and federal monies. (*Id.* ¶ 23.) Pennsylvania's participation in Medicaid is voluntary, but, to receive federal funds, the state's plan must meet all of the federal requirements; Pennsylvania has a federally approved plan. (*Id.* ¶¶ 24-25.)

These programs allow for eligible individuals (Participants) to obtain a Direct Care Worker (DCW) to assist in a variety of personal care and daily living activities. (*Id.* ¶ 30.) The current means of obtaining a DCW under the three programs is: (1) the agency model, whereby a Participant selects an agency from an approved list and the agency provides the DCW, who is the agency's employee; and (2) the Fiscal/Employer Agent (F/EA) model, whereby a Participant selects their own DCW. Under the agency model, the agency is responsible for hiring, training, managing, paying (and related fiscal tasks), and discharging, as well as other administrative tasks related to the DCWs. (*Id.* ¶ 33.) In contrast, in the F/EA model, the Participant trains and supervises their DCW, and is considered "the common law employer." (*Id.* ¶ 34.) For Act 150 and OBRA Waiver Participants, the Office has an agreement with a vendor to provide fiscal and administrative assistance, and for

---

[3] The CHC program is a mandatory managed care program through which individuals receive "home[-] and community-based waiver services or nursing facility services." (Petition ¶ 27.)

[4] The OBRA Waiver program "provides assistance to MA [participants] who have a developmental physical disability to remain at home and in the community as independently as possible." (*Id.* ¶ 28.) The OBRA Waiver program is authorized by Section 1915(c) of the Social Security Act, 42 U.S.C. § 1396n(c).

[5] Act of December 10, 1986, P.L. 1477, No. 150, *as amended*, 62 P.S. §§ 3051-3058. The Act 150 program is a state-funded program for those "who have a physical disability and want to live at home and receive support and services." (*Id.* ¶ 29.)

CHC Participants, the financial oversight was transferred from the Office to a managed care organization (MCO), which in turn hired a vendor to perform those services. (*Id.*)

At issue is the Department's creation of a third model for Participants to obtain DCWs, the AWC model, which is described as being a "hybrid" model. (*Id.* ¶ 3.) Under the AWC model, "eligible Pennsylvanians choose their own caregivers, but those caregivers will then be employed by a single, state-wide agency, []selected by the Department." (*Id.*) This model allows Participants to select their own DCW and refer that worker to a third party, the "AWC Provider," to be hired. (*Id.* ¶ 36.) The Participant is responsible for training, managing, supervising, and discharging, if necessary, the DCW, as well as scheduling and arranging for back-up services, and "is considered the 'managing employer[.]'" (*Id.*) The AWC Provider "is legally responsible for managing the employment-related functions and duties for the [DCWs] selected and referred by the Participants," performing all human resource and payroll functions and providing, *inter alia*, insurance and benefits to the DCWs. (*Id.* ¶ 37.)

The Department did not issue regulations pertaining to or seek amendment of the Human Services Code (Code), 62 P.S. §§ 101-1503,[6] to implement the AWC model. (*Id.* ¶ 5.) Rather, the Department issued the RFA "seeking to secure a single entity to operate as the AWC [Provider] for CHC, OBRA, and Act 150 HCBS [services to] Participants in all 67 counties in the Commonwealth." (*Id.* ¶ 39 (quoting RFA § I-4.A).) The rationale for the AWC model, as set forth in the RFA, is:

---

[6] Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. §§ 101-1503.

4

Through the implementation of an AWC model . . . , the Department is seeking to increase the opportunities for Participant choice and self-direction; improve the efficiency and consistency of HCBS [services] to Participants; identify options for quality improvement strategies and process improvement; and strengthen the Department's capacity to produce and analyze benchmark statistics to support state and federal monitoring of progress toward the goals of Participant choice and self-determination.

(*Id.* ¶ 40 (quoting RFA § I-4.A).) The RFA further states it is within the "sole and complete discretion" of the Department to "reject any application received as a result of th[e] RFA." (*Id.* ¶ 43 (quoting RFA § I-6).)

As part of the RFA's eligibility requirements, an applicant for the AWC Provider must be "independent" from "conflicts of interest" (Conflict Provision). The Conflict Provision states:

**Conflict Free**. To provide an objective, unbiased process, the selected Applicant, and any subcontractors[,] must be free of real or perceived conflicts of interest. By the Operational Effective Date of the agreement, the selected Applicant and its subcontractors must be independent from all [MCOs], Prepaid Inpatient Health Plans, and entities that are enrolled Medicaid service providers providing any HCBS services through CHC, OBRA or Act 150 programs or nursing facilities services, including, but not limited to, entities providing traditional agency model home[ ]care in Pennsylvania. If an Applicant is not conflict free at the time of application submission, it must become conflict free by the Operational Effective Date of the agreement.

If, in its sole discretion, if [sic] the Department determines an Applicant has a conflict of interest or is unable to become conflict free by the Operational Effective Date of the agreement, the Department will not select that Applicant for [Best and Final Offer (BAFO)] or negotiations. If [the Department] discovers a conflict during the agreement term, [the Department] may terminate the agreement for cause.

The Applicant must submit complete organizational information that includes an organization chart listing all subsidiaries and beneficial owners; a listing of all Agreements that the vendor has within

5

Pennsylvania; and a listing of any Agreements of its subsidiaries associated with any MCO, Prepaid Inpatient Health Plan[,] and enrolled Medicaid HCBS service provider doing business in Pennsylvania. If an Applicant is not conflict free at the time of application submission, it must include a plan to become conflict free by the Operational Effective Date of the agreement.

(*Id.* ¶ 41 (quoting RFA § III-7.A).) Responses to the RFA were due on August 29, 2022, but, after receiving a protest to the RFA under Section 1711.1 of the Procurement Code, 62 Pa.C.S. § 1711.1, the Department initially extended the due date and, eventually, stayed the procurement. (*Id.* ¶¶ 44-47 (quoting RFA Addendum 7).) Specifically, the Department stated, "[t]his 'procurement has been stayed due to the filing of protests.' . . . . The Department 'will issue an addendum advising all prospective applicants when the protests have been resolved and providing any additional information necessary to submit applications at a later date.'" (*Id.* ¶ 46 (quoting RFA Addendum 7).)

PHA contends that its members that provide services to Participants through the agency model will be negatively affected by the implementation of the AWC model, particularly where those agencies have offered to hire the Participant-selected DCWs and can and have been providing AWC-type services. (*Id.* ¶¶ 14, 48-51, 53, 56.) PHA avers that its members will be placed at a competitive disadvantage because the chosen AWC Provider "will be able to charge an administrative fee per member," which can result in the AWC Provider being able to pay higher wages, more overtime, and greater benefits than PHA's members. (*Id.* ¶¶ 16, 57.) This is because, PHA alleges, "PHA's members only receive the reimbursement rates (and not an administrative fee) meaning PHA's members must use those rates to pay for all expenses, including wages, benefits, overhead, travel, training, background checks, personal protective equipment, office space, and

6

similar costs." (*Id.* ¶ 17.) This competitive disadvantage, PHA maintains, could result in some members being unable to hire workers or losing workers and being forced to stop providing services. (*Id.* ¶¶ 18, 58, 62-65.) Further, PHA avers the Conflict Provision effectively precludes PHA's members from applying to become the AWC Provider. (*Id.* ¶¶ 42, 70.) According to PHA, the AWC model, and choosing a single AWC Provider, will reduce Participant choice. (*Id.* ¶¶ 52, 54, 66.)

PHA filed its Petition under the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531-7541, on December 29, 2022, setting forth eight counts that challenge the RFA and/or the AWC model. In Count I, PHA contends the AWC model violates the Equal Protection Clauses of the United States Constitution and the Pennsylvania Constitution[7] by (1) excluding home care agencies that provide services using the agency model or have not "cleanse[d] themselves" of that model before the effective date of an AWC Provider agreement; and (2) including the Conflict Provision for some programs but not for others that involve different, but similar clients. (Petition ¶¶ 42, 67-90.) PHA asserts in Count II that the Department lacks the statutory authority under Sections 206 and 403.1(a)(4), (6) of the Code, 62 P.S. §§ 206 (relating to the Department's authority), 403.1(a)(4), (6) (relating, respectively, to the Department's administration of assistance programs regarding provider payments and fees and provider qualifications),[8] to implement the Conflict Provision. (*Id.* ¶¶ 91-101.) In Count III, PHA maintains the Conflict Provision in

---

[7] The Equal Protection Clause of the United States Constitution is found in the Fourteenth Amendment, which states, in pertinent part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. Article I, section 1 of the Pennsylvania Constitution provides: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." PA. CONST. art. I, § 1.

[8] Section 403.1 was added by Section 2 of the Act of June 30, 2011, P.L. 89.

the RFA "impose[s] new rules and regulations on home[ ]care agencies" and, therefore, is a regulation which the Department was required, but did not, properly promulgate. (*Id.* ¶¶ 102-06.)

In Counts IV through VIII, PHA contends the AWC model and Conflict Provision are inconsistent with, and/or preempted by, federal law. Specifically, in Count IV, PHA avers that the AWC model cannot be implemented because it is not contained within the Department's waivers for 2022 that have been federally approved under Section 1915(c) of the Social Security Act (SSA), 42 U.S.C. § 1396n(c). (*Id.* ¶¶ 108-18.) PHA avers in Count V that the Conflict Provision violates and is preempted by Section 1902(a)(19) of the SSA, 42 U.S.C. § 1396a(a)(19), because it is not "consistent with simplicity of administration and the best interests of the recipients." (*Id.* ¶¶ 119-32 (quoting 42 U.S.C. § 1396a(a)(19)) (emphasis omitted).) In Count VI, PHA similarly avers that the AWC model and Conflict Provision violate Section 1902(a)(23) of the SSA, 42 U.S.C. § 1396a(a)(23) and related regulations, because they restrict MA participants' freedom of choice of providers. (*Id.* ¶¶ 133-48.) PHA asserts in Count VII that the AWC model violates Section 1915(c) of the SSA, and related regulations, because it does not adhere to the assurances that Pennsylvania will not restrict or limit Participant access to services contained within Pennsylvania's waivers. (*Id.* ¶¶ 149-54.) Finally, PHA contends in Count VIII that the RFA is arbitrary and capricious in that it will not accomplish its claimed purpose and conflicts with federal law. (*Id.* ¶¶ 155-62.)

As relief, PHA asks the Court to:

> (i) issue a declaration that the RFA, any substantially similar request for applications, and any agreement that arises out of the RFA is [sic] void and unenforceable; (ii) issue a declaration that

the Conflict Provision, or any substantially similar provision included in this or any future RFA by the Department, is void and unenforceable; (iii) issue a declaration that any requirement that covers substantially similar subject matter as the Conflict Provision imposed by the Department on home[ ]care agencies— by contract or otherwise—is void and unenforceable; and (iv) grant such further relief as may be just and appropriate under the circumstances.

(Petition, Wherefore Clause.)

## II.    THE PRELIMINARY OBJECTIONS AND ANSWER

Respondents filed POs to the Petition, seeking its dismissal. In the first PO, Respondents assert PHA does not have standing to present the asserted claims on behalf of its members or on behalf of MA Participants for numerous reasons. (POs ¶¶ 10-17.) Those reasons include: a lack of harm to either PHA or its members; any harm is speculative and contingent on future events; PHA members are not placed in an intolerable position of choosing between two unappealing options – precluding pre-enforcement review; PHA members' interests are not in the zone of interests protected by the SSA, which are those of the MA Participants; and even if the MA Participants are harmed, PHA's interests are not inextricably bound up with those Participants to allow for it to challenge the AWC model and Conflict Provision on their behalf. (*Id.* ¶ 17.)

Respondents' second PO avers a lack of subject matter jurisdiction in this Court because PHA's members' exclusive remedy to assert their claims is to appeal any decision relating to the AWC model under the Procurement Code subject to further appeal to this Court.[9] (*Id.* ¶¶ 18-21.) Respondents point out that, as reflected

---

[9] The Department denied the protests, and those protestors appealed to this Court. *See CareGivers Am., LLC v. Dep't of Hum. Servs.* (Pa. Cmwlth., No. 1287 C.D. 2022); *Phila. Home* **(Footnote continued on next page…)**

in the Petition itself, some of PHA's members, as potential applicants, have exercised those rights and have sought appeals in this Court's appellate jurisdiction. (*Id.* ¶ 20 (citing Petition ¶¶ 45-46).)  Because PHA's members' exclusive remedy is through the Procurement Code, not an action in this Court's original jurisdiction, Respondents argue we lack subject matter jurisdiction to address this matter.  (*Id.* ¶ 21.)

PHA filed an answer to the POs, denying the material averments, and asserting reasons why Respondents' legal arguments regarding standing and this Court's jurisdiction are without merit, including that the POs raise questions of fact that must be resolved through discovery.

The parties have filed briefs in support of their respective positions, and this Court heard oral argument on September 11, 2023.  The POs are now ready for disposition.

## III.    DISCUSSION

### A. *Legal Standards*

#### 1. Declaratory Judgments Act

The Declaratory Judgments Act is used to "declare[] the rights, status, and other legal relations 'whether or not further relief is or could be claimed.'" *Eagleview Corp. Ctr. Ass'n v. Citadel Fed. Credit Union*, 150 A.3d 1024, 1029 (Pa. Cmwlth. 2016) (quoting Section 7532 of the Declaratory Judgments Act, 42 Pa.C.S. § 7532).  "Any person . . . whose rights, status, or other legal relations are affected by a statute [or] . . . contract . . . may have determined any question of construction or validity arising under the . . . statute [or] . . . contract . . . and obtain a declaration

_____

*Health Servs. v. Dep't of Hum. Servs.* (Pa. Cmwlth., No. 1290 C.D. 2022).  After Respondents filed their POs in this matter, these protestors discontinued their appeals in this Court.

10

of rights, status, or other legal relations thereunder." Section 7533 of the Declaratory Judgments Act, 42 Pa.C.S. § 7533.

"[T]he purpose of awarding declaratory relief is to finally settle and make certain the rights or legal status of parties." *Eagleview Corp.*, 150 A.3d at 1029 (quoting *Geisinger Clinic v. Di Cuccio*, 606 A.2d 509, 519 (Pa. Super. 1992)). The Declaratory Judgments Act requires a petitioner "to demonstrate an 'actual controversy' indicating imminent and inevitable litigation and a direct, substantial and present interest." *Cnty. Comm'rs Ass'n of Pa. v. Dinges*, 935 A.2d 926, 931 (Pa. Cmwlth. 2007) (citation omitted). "Declaratory judgments are not obtainable as a matter of right." *Gmerek v. State Ethics Comm'n*, 751 A.2d 1241, 1249 (Pa. Cmwlth. 2000), *aff'd*, 807 A.2d 812 (Pa. 2002). And "whether a court should exercise jurisdiction over a declaratory judgment proceeding is a matter of sound judicial discretion." *Id.* The "grant[] of a petition for a declaratory judgment is a matter lying within the sound discretion of a court [with] original jurisdiction." *Id.*

### 2. Preliminary Objections

In ruling on preliminary objections, this Court "must accept as true all well-pleaded material allegations in the petition for review, as well as all inferences reasonably deduced therefrom." *Stanton-Negley Drug Co. v. Pa. Dep't of Pub. Welfare*, 927 A.2d 671, 673 (Pa. Cmwlth. 2007) (*Stanton-Negley I*). The Court need not, however, "accept as true conclusions of law, unwarranted inferences from facts, argumentative allegations, or expressions of opinion." *Id.* "In order to sustain preliminary objections, it must appear with certainty that the law will not permit recovery, and any doubt should be resolved by a refusal to sustain them." *Id.*

11

*B. Standing*

In their POs and brief, Respondents assert PHA lacks standing both on behalf of its members and Participants, whom PHA claims will be harmed by the AWC model and Conflict Provision, or as a taxpayer. We address these challenges in turn.

1. PHA Standing – PHA Members

In relation to PHA's standing based on its members, Respondents assert that PHA has not established that any of its members are aggrieved because the connection between the alleged violations of law and harm are not immediate or direct. Respondents contend that there is no immediate or direct connection between the violations and the two aggrievements PHA claims its members will suffer, being placed at a competitive disadvantage leading to harm to their business interests and being unable to apply to become the AWC Provider due to the Conflict Provision. According to Respondents, any harm from the alleged competitive disadvantage is not immediate because it is speculative and contingent on facts that may not occur, i.e., DCWs and Participants choosing to move to the AWC Provider. (Respondents' Brief (Br.) at 9-10 (citing *Highley v. Dep't of Transp.*, 195 A.3d 1078, 1082 (Pa. Cmwlth. 2018); *Pittsburgh Palisades Park, LLC v. Commonwealth*, 888 A.2d 655, 660 (Pa. 2005)).) The harm is not direct, Respondents argue, because the alleged violations based on the Conflict Provision did not cause the competitive disadvantage, but is caused by the alleged "superior funding of the AWC Provider." (*Id.* at 14 (citing Petition ¶ 16; *Pittsburgh Palisades*, 888 A.2d at 660).) Finally, Respondents maintain that the Conflict Provision does not explicitly prevent PHA's members from applying to be the AWC Provider and any potential impediment is speculative and, therefore, not immediate for the purposes of standing. The decision of a PHA member to apply and, if selected, divest itself of its current business is a

12

business decision of that member, Respondents argue. It is equally conceivable that one PHA member would choose not to apply, for business reasons, and a second member would, for business reasons, apply and agree to divest itself of its business. As these are equally conceivable, Respondents contend the harm is speculative and does not qualify as immediate.

In its Answer and brief, PHA responds that it has standing based on the immediate and direct harm to its members, which is caused by the AWC model and Conflict Provision. PHA argues that the harm suffered by its members from the unfair competitive advantage given to the chosen AWC Provider is direct, "significant and substantial," and immediate, and sets forth the harms cited in the Petition. (PHA's Br. at 18, 20-23.) PHA argues economic harm, even that which has not yet occurred, can be sufficient to establish standing, and to the extent Respondents challenge the alleged harms, those challenges raise factual issues that require discovery and preclude sustaining the PO. (*Id.* at 24-26 (citing *Allegheny County v. Monzo*, 500 A.2d 1096 (Pa. 1985); *Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1215 (Pa. Cmwlth. 2018)).) PHA also asserts that its members are harmed by the equal protection violations that flow from the inclusion of the Conflict Provision in the RFA, which discriminates against homecare agencies that use the traditional agency model and against homecare agencies within the HCBS programs because a similar provision is not included in other MA programs' agreements. (*Id.* at 18-19.) PHA maintains this harm is directly caused by the Conflict Provision, as without that provision, there would be no discriminatory treatment, and the harm is not remote or speculative because the Department will be moving forward with the RFA. According to PHA, its members also have a direct and immediate interest in not being subjected to unlawfully promulgated regulations

13

or a requirement, the Conflict Provision, that is outside the Department's statutory authority. (*Id.* at 19-20.) Such extralegal actions establish, PHA asserts, that its members are irreparably harmed by the inclusion of the Conflict Provision in the RFA. (*Id.* at 20 (citing *Com. ex rel. Corbett v. Snyder*, 977 A.2d 28, 41 (Pa. Cmwlth. 2009) ("A violation of statutory law constitutes irreparable injury.")).) Finally, PHA asserts its members would have standing because PHA is presenting pure questions of law regarding its equal protection and Pennsylvania statutory claims without the need for additional factual development, which can be adjudicated in a pre-enforcement proceeding for declaratory judgment. (*Id.* at 27.)

Respondents, in their reply brief, reiterate many of their points, and maintain that cases upon which PHA relies do not support that its members are aggrieved by the challenged actions.[10] They further argue that traditional standing principles apply in actions seeking declaratory relief.

As set forth in *Pittsburgh Palisades*:

> Prior to judicial resolution of a dispute, an individual must as a threshold matter show that he has standing to bring the action. . . . The traditional concept of standing focuses on the idea that a person who is not adversely impacted by the matter [they] seek[] to challenge does not having standing to proceed with the court system's dispute resolution process. . . . The courts in our Commonwealth do not render decisions in the abstract or offer purely advisory opinions; consistent therewith, the requirement of standing arises from "the principle that judicial intervention is appropriate only when the underlying controversy is real and concrete . . . ." *City of Philadelphia v. Commonwealth . . .* , 838 A.2d 566, 577 ([Pa.] 2003).

---

[10] To the extent Respondents appear to argue that PHA has failed to state a claim or otherwise establish certain violations of law, (*see* Respondents' Reply Br. at 4-6), Respondents did not include such objections in the POs, and, therefore, they will not be considered. Pennsylvania Rule of Civil Procedure 1028(b), Pa.R.Civ.P. 1028(b) ("All preliminary objections shall be raised at one time.").

14

Stated another way, a controversy is worthy of judicial review only if the individual initiating the legal action has been "aggrieved." *In re Hickson*, . . . 821 A.2d 1238, 1243 ([Pa.] 2003) . . . . This principle is based on the practical reason that unless one has a legally sufficient interest in a matter, that is, is "aggrieved," the courts cannot be assured that there is a legitimate controversy. . . .

With respect to this requirement of being aggrieved, an individual can demonstrate that [they are] aggrieved if [they] can establish that [they have] a substantial, direct, and immediate interest in the outcome of the litigation in order to be deemed to have standing. . . . An interest is "substantial" if it is an interest in the resolution of the challenge which "surpasses the common interests of all citizens in procuring obedience to the law." *In re Hickson*, 821 A.2d at 1243. Likewise, a "direct" interest mandates a showing that the matter complained of "caused harm to the party's interest," *id.*, i.e., causal connection between the harm and the violation of the law. . . . Finally, an interest is "immediate" if the causal connection is not remote or speculative. . . .

The keystone to standing in these terms is that the person must be negatively impacted in some real and direct fashion. If the individual "is not adversely affected in any way by the matter [they] seek[] to challenge[, they are] not 'aggrieved' thereby and ha[ve] no standing to obtain a judicial resolution of [the] challenge. In particular, it is not sufficient for the person claiming to be 'aggrieved' to assert the common interest of all citizens in procuring obedience to the law." *In re Hickson*, 821 A.2d at 1243. . . .

*Pittsburgh Palisades*, 888 A.2d at 659-60 (some citations omitted).

"[A]n organization may have standing to bring a cause of action if at least one of its members has standing individually." *Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 249 A.3d 598, 606 n.11 (Pa. Cmwlth. 2021), *appeal filed*, (Pa., No. 26 MAP 2021). "Where the organization has not shown that any of its members have standing, the fact that the challenged action implicates the organization's mission or purpose is not sufficient to establish standing." *Ams. for Fair Treatment, Inc. v. Phila. Fed'n of Tchrs.*, 150 A.3d 528, 534 (Pa. Cmwlth. 2016).

15

PHA argues that it has sufficiently pled that its members will be aggrieved by the AWC model and the RFA, including the Conflict Provision, such that they, and PHA on their behalf, have standing to challenge those actions as violating equal protection principles, the Department's enabling statute, and the requirements for promulgating regulations. We agree. In considering Respondents' POs, we remain cognizant that we "must accept as true all well-pleaded material allegations in the petition for review, as well as all inferences reasonably deduced therefrom." *Stanton-Negley I*, 927 A.2d at 673.

PHA avers that its members will suffer harm as a result of an award of the RFA and implementation of the AWC model, as currently proposed with the Conflict Provision in effect. In the Petition, PHA avers numerous facts, from which reasonable inferences may be drawn, that support the conclusion that PHA members, and therefore PHA, have standing. For example, PHA alleges reasons why its members will be harmed, including that it will be unable to compete with the AWC Provider in DCW wages and benefits because of the latter's ability to charge an administrative fee, which can be used to pay more and will result in Participant-selected DCWs moving from PHA's members to the AWC Provider. (Petition ¶¶ 16-17, 58-62.) PHA pleads that as "[a] significant percentage" – for some 50% and 80% – "of home[ ]care agencies' current [DCW] workforce is comprised of Participant-selected [DCWs]," the shift in workforce will leave the traditional agency providers without sufficient staff to provide services to Participants. (*Id.* ¶¶ 59-61, 64.) This will result, PHA avers, in the shuttering of some of its members. (*Id.* ¶ 64.) In its brief, Respondents acknowledge that higher wages and benefits "may cause some [DCWs] to move to the AWC Provider," although they maintain numerous other scenarios could occur. (Respondents' Br. at 12.) Accepting PHA's

averments as true, which we must do at this stage of the proceedings, those averments reflect that PHA's members' interests "surpass[] the common interest[s] of all citizens in procuring obedience to the law." *In re Hickson*, 821 A.2d at 1243. Further, in *Monzo*, our Supreme Court has recognized that a competitive disadvantage created by a law can provide standing to challenge the law. 500 A.2d at 1100-01.

As for whether PHA's members' interests are direct, Respondents focus on whether the specific legal claim, i.e., whether the AWC model, RFA, and/or Conflict Provision violates equal protection, the Department's authorizing statute, or the requirements for promulgating a regulation, causes specific harm to PHA's members. However, "the matter complained of" in this litigation **is the implementation of the AWC model and application of the Conflict Provision**, in alleged violation of the law, which PHA has averred **will result in harm** to its members' interests. Accordingly, PHA has adequately pleaded that its members' interests are "direct" because there is "causal connection between the action complained of and the injury to the party challenging it." *In re Hickson*, 821 A.2d at 1243.

Finally, the causal connection between PHA's members' alleged harm and the alleged violations of law is sufficiently close so as to provide them, and, in turn, PHA, standing. That connection, in this pre-enforcement challenge, is based on reasonable inferences from the alleged facts addressed above. The potential that a Participant and the Participant's selected DCW would move from a home care agency using a traditional agency model to the AWC Provider, which purports to pay the DCW more with better benefits, is not as speculative or remote as Respondents claim. Indeed, Respondents acknowledge the potential of movement

17

of DCWs from a home care agency operating under the traditional agency model to the AWC Provider, even though it believes other scenarios could also occur. (Respondents' Br. at 12.) Consequently, PHA's members' interests in this matter are immediate.

Ultimately, we are unpersuaded by Respondents' arguments that PHA has failed to plead that its members will not be "negatively impacted in some real and direct fashion," *Pittsburgh Palisades*, 888 A.2d at 660, by the matter complained of and, therefore, lack standing. In essence, Respondents' arguments would, for the most part, have us disregard the allegations, and reasonable inferences therefrom, to conclude that PHA's members do not have a direct, immediate, and substantial interest in this matter, and that the harm to PHA's members is entirely speculative. This is not the standard for considering POs. *Stanton-Negley I*, 927 A.2d at 673. Because we conclude the Petition contains allegations that, when accepted as true for the purposes of resolving this PO, establish PHA's members' aggrievement as to Counts I, II, and III, it cannot be said with certainty that the law will not allow recovery on this basis.[11] Therefore, we overrule the first PO as to those counts.

### 2. PHA Standing - Participants

As to Participants and Counts IV through VIII, based on violations of federal law, Respondents argue that neither PHA nor its members have standing because they are not in the zone of interests protected by the SSA nor are its or its members' interests inextricably bound up with the interests of the Participants, and, therefore, its interests are not immediate. PHA's interests in this matter, Respondents assert,

---

[11] Because we conclude PHA has standing based on the alleged competitive disadvantage, we do not address Respondents' argument that PHA's members are not aggrieved based on being unable to apply to become the AWC Provider due to the Conflict Provision.

18

are similar to those of the clinics in *Allegheny Reproductive Health Center*, which were insufficient "to assert either Medicaid recipients' rights or [the clinics'] own pecuniary interests." (Respondents' Br. at 16-17.) Respondents contend that the interests protected by the federal law at issue are those of the Participants, and MA providers, like PHA's members, have no property rights in participating in MA programs, in receiving specific amounts from participating in those programs, or in submitting a bid in response to a request for proposals for such program. (*Id.* at 18 (citing, e.g., *Stanton-Negley Drug Co. v. Dep't of Pub. Welfare*, 943 A.2d 377, 384-85 (Pa. Cmwlth. 2008) (*Stanton-Negley II*); *Walizer v. Dep't of Pub. Welfare*, 611 A.2d 1359, 1361 (Pa. Cmwlth. 1992); *Pa. Pharm. Ass'n v. Dep't of Pub. Welfare* 542 F. Supp. 1349, 1355-56 (W.D. Pa. 1982)).) Thus, Respondents assert PHA's members are not in the zone of interests protected by the federal laws at issue. Nor are those members' interests inextricably bound up with those of the Participants, Respondents argue, because their "pecuniary interests can be disentangled or separated from . . . whether the Department complies with [federal] law" because PHA has not explained why protecting its members' financial interests "is the only way to act within the best interests of the MA [Participants] or why protecting their market niche is necessary to protect the health and welfare of MA [Participants]." (*Id.* at 19-20.) Further, Respondents maintain that there is no indication that the MA Participants, themselves, could not assert their own rights, which "prior litigation history [has] show[n] that M[A Participants] are fully able to pursue their claims." (*Id.* at 20 (citing *Allegheny Reprod. Health Ctr.*, 249 A.3d at 607).)

PHA asserts it has standing to challenge the AWC model and Conflict Provision as violating the federal law relating to the MA Program because its interests are inherently intertwined and coextensive with those of Participants. PHA

describes the relationship as being that "Participants have a federally[ ]protected interest in having a choice of providers, and PHA's members have an interest in providing that choice to Participants." (PHA's Br. at 28.) PHA asserts its members' interests are akin to those of the dentists in *Pennsylvania Dental Association v. Department of Health*, 461 A.2d 329 (Pa. Cmwlth. 1983) (*Pennsylvania Dental*), who were found to have standing to raise challenges based on a violation of their patients' privacy interests because they were responsible for, and had possession of, the patients' records and had knowledge of the effect of the challenged regulations. (*Id.* at 29.) According to PHA, "[t]he RFA is an arcane and niche device" that is being used to change how HCBS services are being provided, and Participants are not likely to know of the effect of the RFA, and PHA is better capable of responding to these issues. (*Id.*) PHA argues *Allegheny Reproductive Health Center* is distinguishable because the patients in that case, who would be seeking abortion care, would have advance knowledge that the care sought would not be covered by MA, and, therefore, there was no obstacle to their ability to challenge the alleged infringement of their rights. Unlike in that case, here, there are no clear examples of Participants bringing legal challenges to the Department's policies or solicitations of bids.

In determining whether an entity has standing based on the interests of a third party, this Court, in *Harrisburg School District v. Harrisburg Education Association*, 379 A.2d 893 (Pa. Cmwlth. 1977), adopted the analytic paradigm of *Singleton v. Wulff*, 428 U.S. 106 (1976). Under that paradigm,

> courts should not adjudicate constitutional rights unnecessarily because, *inter alia*, it may be that the holders of these rights do not wish to assert them. Second, the [United States] Supreme Court held, as characterized by this Court, that

20

> third parties themselves usually will be the best proponents of their own rights. The courts depend upon effective advocacy, and therefore should prefer to construe legal rights only when the most effective advocates of those rights are before them.

*Allegheny Reprod. Health Ctr.*, 249 A.3d at 605 (quoting *Harrisburg Sch. Dist.*, 379 A.2d at 895) (emphasis omitted). Further, there must be "some genuine obstacle to [the third party's] assertion, [such that] the third party's absence from court loses its tendency to suggest that [its] right is not truly at stake, or truly important to [it], and the party who is in court becomes by default the right's best available proponent." *Singleton*, 428 U.S. at 116 (noting, for example, that forcing a third party to assert her own right to remain anonymous "'would result in nullification of the right at the very moment of its assertion'") (quoting *Nat'l Ass'n for the Advancement of Colored People v. Alabama*, 357 U.S. 449, 459 (1958)).

Applying that standard in *Harrisburg School District*, we held that school board members' right to privacy was not "inextricably bound up" with the school district's collective bargaining interests, and there was no impediment to the school board members asserting their own interests. 379 A.2d at 896. Therefore, the school district did not have standing to bring claims based on the school board members' interests in preventing union members from picketing in front of their homes. *Id.* We reached a similar conclusion in *Allegheny Reproductive Health Center*. There, we held that the petitioners, medical clinics that provided abortion services, did not have standing to assert the rights of women on MA whose rights the petitioners claimed were violated by excluding abortions from MA coverage except under certain circumstances because they had not established that their interests were "inextricably bound up" with those of the rights of all women receiving MA. 249 A.3d at 608. We likewise noted that the petitioners had not established that there

21

were obstacles to those who were directly affected from filing legal challenges to the law.

In contrast, in *Pennsylvania Dental*, a dental association challenged an amendment to an agreement between an insurer and the association's participating dentists, approved by the Department of Health, that gave the insurer access to patient files as necessary to audit the dentists. 461 A.2d at 330. The dental association asserted the amendment violated the privacy interests of its members' patients and had standing to assert those patients' interests. *Id.* at 331. We agreed, reasoning that the privacy interests of the patients were "inextricably bound up" with the interests of the dentists. *Id.* In finding the association could assert the interests of the patients, we stated that

> unless individual patients had some means of knowing that the effect of the . . . [amendment] may be to disclose some medical information which they may be entitled to withhold by invoking their constitutional claim of privacy, the only way those rights could be protected would be by the dentist who is responsible for the patient's records.

*Id.*

Reviewing the relevant interests asserted by PHA, this matter is more akin to *Allegheny Reproductive Health Center* and *Harrisburg School District* than *Pennsylvania Dental*. In support of its claim that the interests of PHA's members and Participants are inextricably bound up, PHA states that "Participants have a federally[ ]protected interest in having a choice of providers, and PHA's members have an interest in providing that choice to Participants." (PHA's Br. at 28.) Although PHA asserts its members' "interest" in providing choice, i.e., services, it is well settled that MA providers do not have a protected property interest in being able to fully participate in the MA Program, in receiving a specific amount from

22

participating in the MA Program, or in being able to submit bids in response to solicitations for a MA Program. *Stanton-Negley II*, 943 A.2d at 384.

Further, PHA's members' interest in providing services to Participants, which PHA claims will be hindered by the AWC model and Conflict Provision, is similar to those asserted by the petitioners in *Allegheny Reproductive Health Center*, who provided abortion services and whose ability to provide those services to MA Participants was hindered by the law being challenged there. PHA's members interests are not like those in *Pennsylvania Dental*, where the privacy interests of the patients were inextricably bound up with the dentist members' interests because it was the dentists' files containing the patients' private medical information that were being sought, without the patients' awareness. Absent the dentists stepping in and asserting the patients' interests, those interests would not have been raised. *Pennsylvania Dental*, 461 A.2d at 331.

Finally, the obstacle to Participants taking action that PHA cites is that the RFA process is "niche" and "arcane," making it "unlikely" that Participants know about the effect of the change. (PHA's Br. at 29.) However, the obstacle must be "genuine" such that Participants' absence reflects that their rights are not truly at stake or important. *Singleton*, 428 U.S. at 116. PHA's arguments that Participants would be unlikely to know of the change and its effect is undercut by its averment that, when the AWC model was announced, PHA, **along with Participants**, "expressed concern and alarm." (Petition ¶ 48.) Moreover, the RFA is public and posted online on Pennsylvania's "emarketplace,"[12] making it different from the patient files at issue in *Pennsylvania Dental*. And, while PHA characterizes this process as "niche" and "arcane," the object and purpose of the AWC model is clearly

___

[12] *See* www.emarketplace.state.pa.us (last visited 10/19/2023).

23

expressly within the RFA, and it is PHA's position, not necessarily that of all Participants, that harm will occur as a result of the AWC model. That PHA believes, in its view, that Participants may not understand the potential effect does not reflect a "genuine obstacle" that renders their interest not truly at stake, particularly where it pled otherwise. Absent PHA demonstrating that its members' interests are inextricably bound up with those of Participants **and** that there is an obstacle to Participants' protecting their own interests, which PHA has not done, PHA does not have standing to assert Participants' interest to challenge the AWC model and RFA, including the Conflict Provision, as violating federal law.

As for Respondents' contention that PHA lacks standing to raise the federal law claims because its interests do not fall in the zone of interests sought to be protected by those laws, we agree. While standing may be found where the litigant shows that its interest falls "arguably within the zone of interests sought to be protected or regulated by the statute or constitutional guarantee in question," *Application of Biester*, 409 A.2d 848, 851 n.6 (Pa. 1979), it is the interests of the Participants, not the providers, that are protected by those federal laws.

The MA Program's primary goal is to provide the medical assistance needed by those who would otherwise be unable to afford medical care. *Walizer*, 611 A.2d at 1361. Its purpose is to provide health care for the aged and poor, "not to subsidize or otherwise to benefit health care providers." *Pa. Pharm. Ass'n*, 542 F. Supp. at 1355-56 (citing *Green v. Cashman*, 605 F.2d 945, 946 (6th Cir. 1979)). *See also Cabinet for Hum. Res. v. N. Ky. Welfare Rights Ass'n*, 954 F.2d 1179, 1187 (6th Cir. 1992) (The SSA's Medicaid provisions are "not designed to benefit health care providers, but the indigent patients served by those providers"). Indeed, the provisions of federal law PHA claims are violated by the AWC model and

24

RFA/Conflict Provision relate explicitly to the interests of those receiving MA: Count V – Section 1902(c) of the SSA, 42 U.S.C. § 1396a(c) (requiring the provision of safeguards "to assure that eligibility for care and services under the plan . . . will be provided, in a manner consistent with simplicity of administration and the **best interests of the recipients**"); Count VI – Section 1902(a)(23) of the SSA, 42 U.S.C. § 1396a(a)(23) (providing for "Freedom of Choice" for MA recipients by allowing "**any individual eligible for** [**MA** to] . . . obtain such assistance from any institution, agency, . . . or person . . ."); and Count VII – Section 1915(c)(2)(A) of the SSA, 42 U.S.C. § 1396n(c)(2)(A) (requiring states to show that the "necessary safeguards . . . have been taken to protect the health and welfare of **individuals provided services** . . .") (emphasis added). Further, as discussed above, MA providers do not have a protected property interest to fully participate, to receive set amounts for their participation, or to submit bids in response to solicitations for a MA Program. *Stanton-Negley II*, 943 A.2d at 384. The focus on the benefit to individuals receiving MA, and the lack of protected rights for providers, reflect that PHA's members are not in the zone of interests protected by the cited federal laws.

For these reasons, it appears with certainty that the law will not allow recovery on Counts IV through VIII because neither PHA nor its members' interests are inextricably bound up with those of Participants, nor do they fall within the zone of interests protected by the federal law relied upon in Counts IV through VIII, leaving PHA without standing to bring these claims.

### 3. PHA Standing – Taxpayer

Finally, Respondents assert PHA cannot assert taxpayer standing because it cannot meet multiple elements of the test for such standing described in *Pittsburgh Palisades*, 888 A.3d at 661. In particular, the challenged provisions are not likely to

go unchallenged by more appropriate parties, as MA Participants could challenge the alleged violations on their own behalf, and a PHA member or other home care service could challenge, and has challenged, the RFA and Conflict Provision through the Procurement Code. (Respondents' Br. at 22 (citing *CareGivers Am., LLC v. Dep't of Hum. Servs.* (Pa. Cmwlth., No. 1287 C.D. 2022); *Phila. Home Health Servs. v. Dep't of Hum. Servs.* (Pa. Cmwlth., No. 1290 C.D. 2022)).[13])

PHA maintains that it, and its members, have taxpayer standing to assert all the claims in the Petition. According to PHA, there are no other legal actions pending that challenge the RFA and Conflict Provision and that others affected by the AWC model, like the DCW, will benefit from that program. PHA asserts that this means those actions will go unchallenged. (PHA's Br. at 31-32.) Further, it maintains there is "no other mechanism . . . to challenge [the Department's] actions," providing PHA and its members taxpayer standing. (*Id.* at 32.)

Taxpayer standing is an exception to the traditional test for standing. *Pittsburgh Palisades*, 888 A.2d at 661. To establish taxpayer standing, the petitioner must satisfy five requirements:

1. the governmental action would otherwise go unchallenged;

2. those directly and immediately affected by the complained of [matter] are beneficially affected and not inclined to challenge the action;

3. judicial relief is appropriate;

4. redress through other channels is unavailable; and

5. no other persons are better situated to assert the claim.

---

[13] As mentioned, these appeals were voluntarily discontinued after Respondents filed their POs.

26

*Consumer Party of Pa. v. Commonwealth*, 507 A.2d 323, 329 (Pa. 1986).

As we have already concluded that PHA has standing in regard to Counts I through III, we focus on PHA's federal law claims and whether it can assert taxpayer standing in those counts. Initially, it does not appear that the Petition contains averments clearly invoking a claim of taxpayer standing on behalf of PHA and its members. Notwithstanding this, we agree with Respondents that PHA has not established at least the first and second of the five required elements: that the government action will remain unchallenged and that those directly and immediately affected will benefit from the complained-of action and are unlikely to file a challenge. PHA asserts the Department's actions will otherwise go unchallenged because DCWs benefit from the changes in the form of better wages and benefits. However, there are many that are "directly and immediately" affected by the implementation of the AWC model—DCWs, PHA's members, **and Participants**. The Petition is replete with allegations that Participants will not benefit from the implementation of the AWC model, as currently proposed, and that Participants' federal statutory rights are being violated. Thus, it cannot be said that the challenged government action would otherwise go unchallenged because "those directly and immediately affected by the complained[-]of [matter] are beneficially affected." *Id.* Because all of the requirements for taxpayer standing are not satisfied, PHA cannot assert such standing to challenge Counts IV through VIII.

In sum, under the procedural posture of this case, Respondents were required to establish that it "appears with certainty that the law will not permit recovery, and any doubt should be resolved by a refusal to sustain" the POs. *Stanton-Negley I*, 927 A.2d at 673. As it does not "appear with certainty," *id.*, that PHA lacks standing to assert Counts I through III on behalf of its members, we overrule Respondents' first PO as to those counts on this basis. However, because it does "appear with

27

certainty," *id.*, that PHA does not have standing to assert Counts IV through VIII either on behalf of its members or Participants, or based on taxpayer standing, the first PO is sustained as to those counts of the Petition, which are dismissed.

### C. Jurisdiction

#### 1. Exclusivity of the Procurement Code

If this Court finds that PHA has standing, Respondents argue this Court lacks subject matter jurisdiction and, therefore, original jurisdiction, because, under precedent, "the mandatory and exclusive remedy for a potential bidder exists under the Procurement Code, . . . which is subject to an appeal to this Court under its appellate jurisdiction." (Respondents' Br. at 24, 26 (citing *Stanton-Negley I*, 927 A.2d at 673).) As PHA's members' mandatory and exclusive remedy as prospective or disappointed bidders is found in the Procurement Code, Respondents assert this Court lacks subject matter jurisdiction over the claims here. (*Id.* at 26.)

PHA argues Respondents' jurisdictional arguments are misplaced. It disputes that the Procurement Code applies to the RFA because, while the Procurement Code's language is broad, it is inapplicable to grants, and "the RFA clearly seeks to award a grant." (PHA's Br. at 33-34 (citing Section 102(f) of the Procurement Code, 62 Pa.C.S. § 102(f); RFA §§ I-5, I-17, I-19.C, I-20.B.2, I-22, III-1).) In addition to the RFA's repeated use of the word "grant," PHA argues the RFA and AWC model neatly fit into the Procurement Code's definition of "grant," as the Department is selecting a provider to administer the AWC model, not to obtain goods or services for its own use. PHA further argues that not all of its members fit the category of entities covered by the Procurement Code because only a small number of its 700 members attended pre-application sessions to express interest in applying for the RFA, and many of its members "may not be interested in serving as the [single]

AWC Provider or could not qualify for the role even if they were interested," notwithstanding that they will be harmed if the AWC model is implemented. (*Id.* at 35.) Because those members would not qualify to proceed under the Procurement Code but are nonetheless aggrieved, PHA contends those members retained the right to file this action in our original jurisdiction. (*Id.* at 36 (citing *GTECH Corp. v. Dep't of Revenue*, 965 A.2d 1276 (Pa. Cmwlth. 2009) (holding that a taxpayer can file an action in this Court's original jurisdiction to protest the award of a contract)).)

In its reply brief, Respondents argue that, under *Stanton-Negley I* and *Aetna Better Health of Pennsylvania, Inc. v. Department of Human Services* (Pa. Cmwlth., No. 351 M.D. 2016, filed July 19, 2016) (Brobson, J.) (single-judge op.) (*Aetna*),[14] the Procurement Code is the mandatory and exclusive remedy for any agreement, whether characterized as a grant or contract, related to the MA Program. (Respondents' Reply Br. at 20-21.) Respondents contend that, in *Aetna*, a single judge of this Court granted a preliminary injunction precluding the award of a grant pending final review based, in part, on a finding that the Department was judicially estopped from arguing that the bid protest of a solicitation for a grant was outside the scope of the Procurement Code because, in *Stanton-Negley I*, the Department had argued that this procedure was the exclusive means to protest an agreement for services under the MA Program. (*Id.* at 22-23 (citing *Aetna*, slip op. at 25-27).) Under these cases, the bid protest mechanism made available to those that wanted to protest the RFA was exclusive, and Respondents assert the same reasoning should apply here.

---

[14] Respondents cite *Aetna* for its persuasive value pursuant to Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a). *See also* Pennsylvania Rule of Appellate Procedure 126(b)(1)-(2), Pa.R.A.P. 126(b)(1)-(2).

Section 1711.1(a) of the Procurement Code provides a general right of protest to "[a] bidder or offeror, a prospective bidder or offeror or a prospective contractor that is aggrieved in connection with the solicitation or award of a contract." 62 Pa.C.S. § 1711.1(a). A "contract" is "[a] type of written agreement, regardless of what it may be called, for the procurement or disposal of supplies, services or construction . . . ." Section 103 of the Procurement Code, 62 Pa.C.S. § 103. Thus, relevantly, the Procurement Code will apply if a contract is for the procurement of services, and both of those terms are defined therein. Procurement is "[b]uying, purchasing, renting, leasing, licensing or otherwise acquiring any supplies, services or construction." *Id.* And services are "[t]he furnishing of labor, time or effort by a contractor not involving the delivery of a specific end product other than drawings, specifications or reports which are merely incidental to the required performance," but "does not include employment agreements . . . ." *Id.* However, per Section 102(f), the Procurement Code "**does not apply to grants**. For the purpose of this part, a grant is the furnishing of assistance by the Commonwealth or any person, whether financial or otherwise, to any person to support a program. . . ." 62 Pa.C.S. § 102(f) (emphasis added).

A protest is to be filed, in writing, with the head of the purchasing agency. 62 Pa.C.S. § 1711.1(b). Section 1711.1(*l*) provides that protests under this section "shall be the **exclusive procedure** for protesting a **solicitation** or award of a **contract** by a bidder or offeror a prospective bidder or offeror, or a prospective contractor that is aggrieved in connection with the solicitation or award of a contract." 62 Pa.C.S. § 1711.1(*l*) (emphasis added). "Thus, . . . the Procurement Code sets forth the mandatory and exclusive remedy for disappointed bidders, offerors, prospective bidders or offerors, and prospective contractors, to challenge

30

the solicitation or **award of a contract**." *Stanton-Negley I*, 927 A.2d at 673 (emphasis added). Respondents assert that this matter falls within scope of the Procurement Code, while PHA argues that the Procurement Code is inapplicable to the challenge here because the RFA awards a grant, not a contract.

There can be no dispute that Section 102(f) plainly reflects that grants are not governed by the Procurement Code. *Id.*; *U.S. Venture, Inc. v. Commonwealth*, 255 A.3d 321, 337 (Pa. 2021). In *U.S. Venture, Inc.*, our Supreme Court recently examined Section 102(f) and the meaning of the term "grant" used therein. In addition to the statutory definition, which reflects that a "grant [is] given to 'furnish['] . . . assistance . . . to any person or support program," the Supreme Court considered dictionary definitions of "grant" as meaning "something granted **especially**: a gift (as of land or money) for a particular purpose" and as being synonymous with a "subsidy," meaning "[a] grant, usu[ally] made by the government, to any enterprise whose promotion is considered to be in the public interest." *Id.* at 341-42 (citations omitted; emphasis in original). It reviewed the grant at issue in that case, funds to add "[clean natural gas] pumps at existing service stations," and concluded that the purpose of the grant was "to promote the Commonwealth's Alternative and Clean Energy [(ACE)] program," and that "[t]he Commonwealth received nothing from that deal other than the advancement of its desire to promote the ACE program and reduce harmful emissions." *Id.* at 342. Accordingly, the Supreme Court concluded that "[t]he Commonwealth gifted [the petitioner] the grant funds, subject to the conditions [] outlined within the agreements," which "were designed to further the Commonwealth's clean energy policy . . . ." *Id.*

31

Here, the RFA consistently uses the term "grant" to describe what will be awarded in the one "grant agreement" the Department seeks to award, and that the chosen applicant will provide "grant services" and be supervised by a "Grant Administrator" assigned by the Office. (*See, e.g.*, RFA §§ I-5, I-19.C, I-20.B.2, I-22, I-23, II-3, III-1, III-6.G.[15]) This fact, alone, raises questions over whether the Procurement Code would apply to the RFA pursuant to Section 102(f). Additionally, the "grant agreement" being awarded relates, not to the "procurement or disposal of supplies, services or construction" to be provided to the Commonwealth, 62 Pa.C.S. § 103 (defining contract), but to "furnishing [] assistance . . . to a[] person," Participants who want to choose their own DCW without having the burden of being a common law employer, "or [] to . . . support [a] program," the HCBS program's purpose to allow Participants to remain at home and receive services there, 62 Pa.C.S. § 102(f) (defining grant); (RFA § I-3 ("Under AWC, **the Participant** is supported by an agency that provides employment related functions to the [DCW] selected by the Participant."), § I-4 ("The Department is seeking to secure a single entity to operate as the AWC [Provider] **for** . . . **Participants** . . . .") (emphasis added)). As in *U.S. Venture, Inc.*, this language suggests that the grant would be **especially** used "for a particular purpose" in order to promote the public interest and the Commonwealth's HCBS-related policies. 255 A.3d at 341-42. In light of the repeated use of the term "grant" and identifying the Participant as the beneficiary of the support provided by the chosen AWC Provider, we cannot say that Respondents have established "with **certainty** that the [Procurement Code] will not permit recovery" on this basis. *Stanton-Negley I*, 927 A.2d at 673 (emphasis added).

---

[15] Although the RFA is not attached to the Petition, it is referenced throughout the Petition and its location is set forth in paragraph 38 of the Petition.

Neither *Stanton-Negley I* nor *Aetna* persuade the Court that the Department has met its burden for purposes of its PO. First, *Stanton-Negley I* involved a challenge to a request for proposal for two contractors to provide "specialty drugs" to MA Participants, which was alleged by the petitioner to eliminate local pharmacies from the process, in violation of the United States and Pennsylvania Constitutions, as well as federal and state law and regulations. That opinion contains **no** reference to the agreement at issue being for grant funds or to Section 102(f), let alone a holding that the bid protest procedures of the Procurement Code applied to the award of a grant. Second, *Aetna*, a single-judge opinion granting a preliminary injunction that is only persuasive and was not a final decision on the merits of the underlying claim, *see Appeal of Little Britain Twp.*, 651 A.2d 606, 611 (Pa. Cmwlth. 1994), held that the **Department** was judicially estopped by its successful position in *Stanton-Negley I* from arguing that any agreements for services under the MA Program were not within the scope of the Procurement Code based on Section 102(f). It did not hold that **another party**, like PHA here, could not make such argument. Thus, we are not persuaded that these cases make it "certain[] that the [Procurement Code] will not permit recovery." *Stanton-Negley I*, 927 A.2d at 673.

Further, it does not appear that the RFA would meet the definitions of "procurement" and "services." Through the RFA, the Department is not "[b]uying, purchasing, renting, leasing, licensing or otherwise acquiring any supplies, services or construction," 62 Pa.C.S. § 103, but is providing money to incentivize and support a program. Even if it could be viewed as a purchase of services, the RFA establishes, essentially, an employment agreement between the DCW and the AWC Provider. Not being for the procurement of services, the RFA does not otherwise fall within the scope of the Procurement Code.

33

## 2. Sovereign Immunity

Respondents also assert in their brief in support of the POs that Pennsylvania has only waived its sovereign immunity for claims based on contracts, or the solicitation of contracts, when they are brought as "bid protests under Section 1711.1 of the Procurement Code," 62 Pa.C.S. § 1711.1. (Respondents' Br. at 25 (citing *Highley*, 195 A.3d at 1078; Section 1702 of the Procurement Code, 62 Pa.C.S. § 1702).) Because this claim is not being brought as a bid protest, Respondents asserts that they are immune from suit here.

PHA argues that Respondents' sovereign immunity arguments are misplaced as the Procurement Code does not preclude this claim and that declaratory judgment actions are not barred under that doctrine. (*Id.* at 37 (citing *GTECH Corp.*, 965 A.2d at 1286 n.19; *Brimmeier v. Pa. Tpk. Comm'n*, 147 A.3d 954, 961 (Pa. Cmwlth. 2016)).)

As a threshold matter, we observe that Respondents did not raise their claim of sovereign immunity in their POs, but in their brief in support of the POs. Because Respondents did not include this objection in the POs, it will not be considered. Pennsylvania Rule of Civil Procedure 1028(b), Pa.R.Civ.P. 1028(b) ("All preliminary objections shall be raised at one time."). Even if it was properly raised, Respondents' arguments are not persuasive.

In addition to reviewing the meaning of the term "grant" in Section 102(f), our Supreme Court in *U.S. Venture, Inc.* explained that "at common law[,] sovereign immunity barred a claimant from asserting a claim against the Commonwealth based upon [a] contract," but that "[t]he present immunity scheme is based entirely on the constitutional and statutory law, since this Court has deemed the common[ ]law justifications for sovereign immunity to be invalid." 255 A.3d at 329 (citations

34

omitted).  The Procurement "Code 'waive[s] sovereign immunity as a bar to claims against Commonwealth agencies brought in accordance with [S]ections 1711.1 (relating to protests of solicitations or awards) and 1712.1 (relating to contract controversies) and Subchapter C (relating to Board of Claims) but only to the extent set forth in this chapter.'"  *Id.* (quoting 62 Pa.C.S. § 1702(b)).  Based on these provisions, along with Section 102(f), the Supreme Court held that a claim made to the Board of Claims by an entity asserting it was entitled to disbursement of grant funds, which had been denied based on how the entity had constructed and financed the project, was barred by sovereign immunity.  *Id.* at 336, 343.  In finding that the dismissal of the claim was proper, the Supreme Court observed that the limited waiver of sovereign immunity set forth in the Procurement Code did **not** apply to "disputes involving grants," as Section 102(f) excluded those claims from the Procurement Code's scope.  *Id.* at 337.

Although it is not clear and without doubt that the Procurement Code applies here, thereby raising the potential specter of sovereign immunity, PHA has brought its claims under the Declaratory Judgments Act and seeks declaratory and injunctive relief, rather than damages in the nature of disbursement of grant funds, as was the case in *U.S. Venture, Inc*.  "[T]he law is clear that sovereign immunity **does not bar** . . . declaratory judgment actions."  *Brimmeier*, 147 A.3d at 961.  Nor does it bar an "injunction seeking to **prohibit** state parties, i.e., state agencies or employees, from acting."  *Finn v. Rendell*, 990 A.2d 100, 105 (Pa. Cmwlth. 2010).  Therefore, to the extent Respondents assert in their second PO that they are immune from suit, that claim is rejected.

In sum, under the procedural posture of this case, Respondents were required to establish that it "appears with certainty that the law will not permit recovery, and

35

any doubt should be resolved by a refusal to sustain them." *Stanton-Negley I*, 927 A.2d at 673. As it does not "appear with certainty" that the Procurement Code or, if properly raised, sovereign immunity "will not permit recovery," we overrule Respondents' second PO asserting that this Court lacks subject matter jurisdiction based on the Procurement Code providing the mandatory and exclusive remedy here or that sovereign immunity would bar these claims, if properly raised.[16]

## IV. CONCLUSION

For the foregoing reasons, we overrule Respondents' first PO to the extent it seeks dismissal of Counts I through III based on PHA's lack of standing, but sustain it as to Counts IV through VIII, and we dismiss Counts IV through VIII. In addition, we overrule Respondents' second PO asserting that this Court lacks subject matter jurisdiction.

_____
**RENÉE COHN JUBELIRER,** President Judge

---

[16] Based on disposition on these two arguments, we do not address PHA's arguments that not all of its members would be covered by the Procurement Code.

36

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

PA Home Care Association,
               Petitioner

               v.

The Commonwealth of Pennsylvania,
Department of Human Services;
Meg Snead, in her official capacity as
Acting Secretary of the Department of
Human Services; Jamie Buchenauer,
in her official capacity as Deputy
Secretary for the Department of
Human Services' Office of Long-Term
Living,
               Respondents

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No. 629 M.D. 2022

## O R D E R

**NOW**, October 20, 2023, the Preliminary Objections of The Commonwealth of Pennsylvania, Department of Human Services (Department); Dr. Valerie Arkoosh, in her official capacity as Secretary of Human Services; and Jamie Buchenauer, in her official capacity as Deputy Secretary for the Department's Office of Long-Term Living (collectively, Respondents), are **OVERRULED IN PART** and **SUSTAINED IN PART** in accordance with the foregoing opinion, and Counts IV through VIII of the Petition for Review in the Nature of a Complaint for Declaratory Relief (Petition) filed by PA Home Care Association are **DISMISSED**. Respondents are directed to file an Answer to the remaining counts of the Petition no later than 30 days from the exit date of this Order.

_____
**RENÉE COHN JUBELIRER,** President Judge